OPINION TO THE GOVERNOR.

NOVEMBER 14, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

Opinion to the Governor relative to "Community Redevelopment Act" following request in accordance with section 2 of article XII of amendments to constitution of Rhode Island.

November 14, 1949

To His Excellency John O. Pastore,

Governor of the State of Rhode Island
and Providence Plantations.

We have received from your excellency a request for our written opinion, in accordance with the provisions of section 2 of article XII of amendments to the constitution of this state, upon the following questions:

"1. Does the redevelopment of so-called blighted areas in accordance with Chapter 1802 of the Public Laws approved April 26, 1946, as amended by Chapter 2029 of the Public Laws of 1948 and by Chapter 2265 of the Public Laws of 1949, including the establishment of redevelopment revolving funds pursuant to Section 46 thereof as amended, constitute a public purpose for which public money may be spent, private property may be taken by condemnation, public debt may be incurred and taxes may be levied, within the fundamental principle of constitutional law that these things may be done only for a public purpose and not for a private purpose (See Opinion to the Governor, 63 Atl. (2d) 724)?

2. Does the creation of redevelopment agencies with the power of eminent domain pursuant to the legislation

referred to in the preceding question violate Section 1 of Article IX of the Amendments of the Constitution of Rhode Island?"

Upon receipt of the above request the city of Providence, which apparently has a present interest in ascertaining the constitutionality of the act therein described, commonly known as the "Community Redevelopment Act" but which we will hereinafter call the act for convenience, asked and received permission to file a brief in support of the act. Pursuant to this permission the city filed a brief and later furnished us with an additional memorandum of authorities. The act is so lengthy as to preclude us from setting forth herein its many interlocking provisions with any pretence of completeness. We can only give here a summary in outline of its most important provisions.

Section 2 sets out in a most comprehensive manner the legislative finding, the policy of the state, and the purpose of the act. The legislature therein found and declared that there exist *"blighted areas,"* (italics ours) consisting of both improved and unimproved land, in many communities in this state; that such areas are "conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime" because of the existence therein of buildings and structures, either used or intended to be used for living, commercial, industrial or other purposes, or any combination of such uses, which are "unfit or unsafe to occupy" by reason of overcrowding, inadequate provision for ventilation, light, sanitation, open spaces and recreation facilities, obsolescence, deterioration and dilapidation; that such areas present difficulties and handicaps which are beyond remedy and control solely by *regulatory process;* and that the menace to the public health, safety and welfare from blighted areas is becoming "increasingly direct and substantial in its significance and effect."

The legislature also found and declared that such conditions of blight tend to foster further obsolescence, deterioration and disuse because of lack of incentive on the part of

individual landowners, who are unable of themselves to assemble the lands for rehabilitation because of "lack of the legal power" necessary for, and the excessive costs involved in, the private acquisition of the real property of the area; that the remedying of such conditions may require the "public acquisition" of adequate areas and the clearance thereof through demolition of inadequate, unsafe and insanitary buildings; and that the blighted areas should be redeveloped "under proper supervision, with appropriate planning, necessary financial assistance, and continuing land use and construction policies."

For the reasons more fully set forth in said section the legislature declared that it is the policy of the state to protect and promote the sound development and redevelopment of *blighted areas*; that when such end cannot be accomplished by private enterprise alone it is in the public interest to employ the power of eminent domain, to advance or expend public funds, and to provide a means whereby the blighted areas may be redeveloped for that purpose; and that the redevelopment of such areas with provision for appropriate continuing land use and construction policies therein "constitute public uses and purposes for which public money may be advanced or expended and private property acquired, and are governmental functions of state concern in the interest of the health, safety and welfare of the people of the state generally and particularly of the people of the communities of the state in which such areas exist * * *."

A "redevelopment area" is defined in sec. 5 as an area of a community which the legislative body thereof finds is a *blighted area* whose redevelopment is necessary to effectuate the public purposes declared in the act. Such an area is within the purview of the act if the buildings, improvements, or land therein that are inimical to the public health, safety or welfare, *"predominate and injuriously affect the entire area."* (italics ours)

Section 15 defines "redevelopment" as the planning, clearance, reconstruction or rehabilitation of a redevelopment area with provision for such residential, commercial, industrial and public structures or spaces, including recreational facilities, as may be appropriate or necessary to carry out the real purpose of the act. The term also includes the replanning or original development of undeveloped areas which by reason of certain specified causes have become stagnant and require reclamation. This section further provides that a blighted area may include therein buildings, improvements, or lands which of themselves are not detrimental to the public interests but whose inclusion is found necessary, with or without change in their condition or use, for the effective redevelopment of the area of which they are a part.

To accomplish its purpose the act creates in each community "a public body, corporate and politic, exercising public and essential governmental functions," (sec. 45), to be known as the "redevelopment agency of the community," (sec. 34), hereinafter called the agency, which shall not transact any business or exercise any of its powers unless and until the legislative body of the community shall by resolution declare that there is need for the agency to function in such community, (sec. 35).

The powers of the agency are set forth in great detail in secs. 45, 71 and 73. The most important powers in sec. 45 are as follows: to acquire real or personal property by purchase, lease or otherwise; to acquire any real property by the exercise of the power of eminent domain; to clear the property so acquired of buildings and structures and to develop it as building sites; to sell, lease or otherwise dispose of such property at its value based on estimated income to be received from any legal use thereof; and to obligate buyers or lessees to use the property for the purpose designated in the redevelopment plans by covenants or conditions running with the land, whose breach shall cause the fee to revert to the agency. This section specifically

denies to the agency the right "to construct any of the buildings for residential, commercial, industrial, or other use contemplated by the redevelopment plan * * *." In secs. 71 and 73 the agency is given power to issue tax exempt bonds for an essential governmental purpose, which bonds "shall not be a debt of the community, the state or any political subdivision thereof," and shall be payable exclusively from the income and revenues of the redevelopment projects for which they were issued together with any contributions or financial assistance from the state or federal governments.

In order for a municipality to come within the provisions of the act it *must* have a planning commission and a master or general community plan prepared in accordance with certain specified requirements, (secs. 20, 21). When by resolution the legislative body of a community shall declare that there is need for a redevelopment agency to function, (sec. 35), the mayor or the president of the town council shall appoint five resident electors, possessing certain prescribed qualifications as members of the agency, (sec. 37), who shall thereafter discharge the powers granted to the agency by the act.

Omitting reference to many provisions concerning the preparation and consideration of tentative plans, the act provides that before adopting a redevelopment plan the legislative body of the community shall consider (1) whether it conforms to the master or general community plan, (sec. 50), and if carried out that it would redevelop the area therein described in the interests of the public peace, health, safety, and welfare, (sec. 59); (2) whether the carrying out of the plan, which may provide for the issuance of bonds of the agency, (sec. 65), is economically sound and feasible; and (3) whether partial tax abatement for the project area and its improvements is necessary to the carrying out of the plan, (sec. 60). The official redevelopment plan must be adopted by ordinance (sec. 67) which will become effective

unless stayed by legal proceedings within a specified time, (sec. 69).

In section 46 the act further authorizes the legislative body of a community to establish a "redevelopment revolving fund" for the public purpose described in the act by the appropriation of tax money or the issuance of municipal revenue bonds, subject, however, to the express condition that if the amount of such bonds exceeds "any limitation, by general or special law," the excess bonded indebtedness must first be "approved by the voters of such community at any general or special election."

It is not to be denied that the program described in the act is broad. While the act, which is of state-wide application and directly creates for each community "a public body, corporate and politic, exercising public and essential governmental functions," may be novel with us as to the method therein prescribed for accomplishing its avowed public purpose, the answers to the constitutional questions now before us depend fundamentally upon whether property acquired by an agency for the purpose of eliminating *blighted areas* that are "conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime" is a *public use* within the legal meaning of that term.

It is elementary in constitutional law that the public money may be expended for or devoted to a public use but not to a private purpose. The difficulty in this class of cases arises from the fact that the term "public use" is not capable of exact definition. In 2 Cooley's Const. Lim. (8th ed.), 1131, it is said that a public use can be found to exist "where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty— perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide."

There being no general test by which to determine whether the fundamental purpose of a statute is for a public or private use, the decision in each case must therefore depend upon its own particular facts, especially if the statute presents a dual aspect: one looking definitely to the accomplishment of a clearly public purpose, and the other indicating a possible advantage to private interests. In such a case, as in all instances of statutory construction, the legal problem presented is to determine the legislative intent from a consideration of the entire statute.

We concede that the act here in question might have been given a much broader construction and application than the one given to it in this opinion had it been enacted under an appropriate constitutional amendment, as was the case in *Matter of Murray* v. *LaGuardia,* 291 N. Y. 320, certiorari denied, 321 U. S. 771. But it does not necessarily follow that in the absence of such explicit authority the statute is unconstitutional. Its constitutionality is unaffected if the primary purpose of the legislature, though limited in scope by construction, was to eliminate blighted areas in which the predominant conditions were a continuing menace to the public health and safety. The fact that following the elimination of such blighted areas some incidental advantage might enure to private interests does not make the statute unconstitutional, especially if that advantage is secured upon conditions for the public good.

We have no doubt that ordinarily a statute will be held void where it authorizes the taking of private property for a use partly public and partly private and the private use is so combined with the public use that the two cannot be separated. See *Kessler* v. *City of Indianapolis,* 199 Ind. 420; *Smith* v. *Western Maine Power Co.,* 125 Me. 238. That is not the case here. Futhermore, in the situation now before us we need not concern ourselves with whether a mere advantage, benefit or convenience to the public is a public use, as the legislature's declared purpose is to eradi-

cate sources of disease, juvenile delinquency and crime, which in our opinion clearly constitute a public use.

The wisdom or feasibility of a statute is not for the court to consider in determining the legislative intent. If in the present case, for instance, the legislature's primary purpose was to eliminate blighted areas in the interest of the public health, safety and welfare and to that end it adopted as a matter of policy the method specified in the act, we are not free to question its judgment as to such method. It is not for us to determine matters of policy or to express any opinion as to the adequacy of the method adopted by the legislature to accomplish its primary purpose. The responsibility for the successful operation of the act rests with the legislature. The sole question for our consideration is whether in adopting such an act the legislature acted within its constitutional power.

In the present circumstances the legislature has set out its findings, the purpose of the act and the policy of the state in great detail, far fuller in fact than in any statement that has come to our attention appearing in similar statutes in other jurisdictions. As hereinbefore appears in our summary of the act the legislature found that "blighted areas," comprising both developed and undeveloped land, exist in this state, which areas are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime by reason of the existence in such areas of buildings and structures, either used or intended to be used for living, commercial, industrial or other purposes, that "are unfit or unsafe to occupy" because of insanitary conditions due to various causes, obsolescence, and deterioration. The legislature further found that such buildings and structures should be demolished and the blighted areas redeveloped in the interest of the public health and safety of the people of the state generally and particularly of those in the communities in which such areas exist. It therefore declared that the purpose of the act was to use public funds for a public purpose in order to remove deleterious conditions

that are beyond ordinary "regulatory process" and that private interests are unable or unwilling to correct.

While the ultimate determination of the character of the use or purpose is a judicial and not a legislative question, yet where the legislature declares a particular use or purpose to be a "public use" such a declaration must be given weight and will control unless the use or purpose in question is obviously of a private character. *Narragansett Electric Lighting Co.* v. *Sabre,* 50 R. I. 288, 298; *City of Newport* v. *Newport Water Corp.,* 57 R. I. 269, 275. In *Block* v. *Hirsh,* 256 U. S. 135, at page 154, the supreme court said that "a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect."

In considering the present act we are not left to speculate or conjecture as to what the legislature meant by the term "blighted areas." It has defined such an area as one in which buildings, improvements, structures or land inimical to the public health, safety or welfare *"predominate and injuriously affect the entire area."* (italics ours) To come within the act and thus be subject to redevelopment in accordance with its terms the area, irrespective of the private uses therein included, must be found to contain not only a predominance of buildings, improvements, structures or land which of themselves are "unfit or unsafe" for occupancy and use, but it must also be further found that collectively their present deleterious condition, due to overcrowding, insanitary conditions, obsolescence, deterioration or disuse, presently injuriously affects the entire area to the harm of its immediate inhabitants and of the people of the state generally.

When the language of the legislature in secs. 2, 5 and 15 hereinbefore outlined is read as a whole it is clear to us that such language requires a finding by the legislative body of the community that any blighted area, so called, is as a matter of fact predominantly affected by conditions which are the equivalent of or strongly similar to those existing

in what is more plainly and commonly called a slum. For instance, in *Dornan* v. *Philadelphia Housing Authority*, 331 Pa. 209, the constitutionality of a statute for slum clearance and the construction of adequate dwellings for persons of low income was in question. In that statute a "slum" was defined as "Any area in which there is a *predominance* of structures which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health, and morals." (italics ours) In a comprehensive majority opinion five justices of that court concurred in finding the statute constitutional inasmuch as its fundamental purpose was for a public use, while two justices dissented without stating their reasons therefor. All factors in the definition of a slum in the Pennsylvania statute, if not more, are expressed in greater detail in the act now before us.

After serious consideration we are of the opinion that the primary purpose of the present act is the elimination of areas which, though perhaps not actually slums, predominantly show such a marked degree of degeneration as to constitute a menace to the life, health and safety of persons who are obliged to live or work within the limits of such areas and to the people of the state generally. Although the injurious effect from the continued existence of palpably deplorable conditions in such areas may appear to be local, nevertheless there is at least the threat, if not the probability, that the pernicious influences of disease, juvenile delinquency and crime engendered therein may spread to and manifest themselves in other localities to the detriment of the public generally. Construed in this manner we are of the opinion that the act was primarily intended to serve a public purpose and that the property taken in accordance with its terms is for a public use.

In reaching this conclusion we have followed the well-settled rule that a statute is presumed constitutional and should be sustained unless its unconstitutionality is clear

beyond a reasonable doubt. In *State* v. *District of Narragansett,* 16 R. I. 424, 439, this court said that in determining the constitutionality of an act "a becoming deference to the legislature inculcates caution." And in *Fletcher* v. *Peck,* 6 Cranch 87, 128, Chief Justice Marshall used the following language: "The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case."

As already stated, it is not for us to consider whether the act in question is wise or unwise. On this point we have accepted and given weight to the findings of the legislature so fully expressed in the act, which findings, having been made by those charged with the duty of initiating and approving the act, we cannot say are obviously unreasonable or unwarranted in the absence of any evidence to the contrary. However, by our present opinion we are not to be understood as holding that under this act a community through an agency may engage in a redevelopment project based mainly upon esthetic views or upon considerations of economic advantage to the municipality, or a combination of both. Unless it is found that under the act, as herein construed and limited, a community redevelopment program is necessary to protect the public health, morals and safety through the elimination of blighted areas the act does not apply.

The eradication of the social evils existing in and emanating from a blighted area apparently being beyond the reach of private interests because of the difficulty and cost in assembling and clearing the land in such area, the legislature, acting under the police power of the state, granted the power of eminent domain to an agency which is defined as "a public body, corporate and politic, exercising public and essential governmental functions." The supreme court of the United States has been consistently liberal in sustaining the validity of acts as being for a public use whenever it appeared that the appropriation of private property

under the right of eminent domain subserved a substantial public purpose. See *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112; *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.,* 240 U. S. 30; *Jones* v. *City of Portland,* 245 U. S. 217. It is our judgment, therefore, that the assembly of property in a blighted area and the elimination therefrom of unsafe, insanitary and dilapidated structures in the manner and to the extent prescribed in the act as herein construed are legitimate objects for the exercise of the police power by the legislature and that the grant thereunder of the right of eminent domain to an agency as defined in this act violates no constitutional provision.

The present act, as limited in this opinion, does not authorize a municipality through an agency to engage in the real estate business generally; or to enter upon the utilization of so-called stagnant and unproductive vacant areas the development of which might be potentially more useful and remunerative to a community but which are not in themselves blighted areas, that is, undeveloped lands with conditions predominantly inimical to the public welfare; or to expend the public funds for the mere advantage of private interests. Its primary object is to assemble property, whether developed or undeveloped, in a blighted area and to remove therefrom all buildings, structures and other conditions that constitute a menace to the public health and safety. Upon the elimination of a blighted area, thus enhancing the public good, the primary purpose of the act has been accomplished. With the attainment of these fundamentally public purposes the property acquired and held by an agency has been thus clearly devoted to a public use. We see no valid objection to the constitutionality of the act on the ground that the agency may thereafter convey to private interests the property so reclaimed with conditions and restrictions intended to protect the public health and safety from the recurrence of blight in the future. In other words, it is of no con-

sequence if in redeveloping the area private interests may derive some benefit as an incident to the accomplished public purpose.

We further believe that the act is not objectionable on the ground of improper delegation of legislative power. What shall constitute a blighted area within the meaning of the act is therein described in unmistakable language. The nature and extent of a blighted area must necessarily vary not only in the different cities and towns but also within the same community. All that the legislature can reasonably do in the circumstances is to prescribe a fixed standard and rules of general application adapted to accomplish the purpose of the act, leaving to the respective local authorities the responsibility of ascertaining as a matter of fact whether there exists in the community a blighted area within the meaning of the act as herein construed that requires redevelopment in the public interests. The determination of that factual question by the municipality is an administrative act and not the exercise of legislative power.

In our consideration of the first question the only other matters of fundamental importance that occur to us, as we are presently advised, are: first, whether the act authorizes a redevelopment agency to create a state debt in violation of article IV, sec. 13, of the Rhode Island constitution which provides that the general assembly shall have no power, without the express consent of the people, to incur state debts to an amount exceeding $50,000; and, secondly, whether the act authorizes such an agency to incur obligations binding a municipality in excess of its debt limit.

We find no objection to the validity of the act on either of those grounds. While the agency is given the power to issue bonds in its discretion for any of its corporate purposes, the bonds are payable exclusively from the income and revenues of the redevelopment projects financed with the proceeds of those bonds, or with such proceeds together with financial assistance from the state or federal govern-

ments in aid of such projects. Further, the act specifically provides that "The bonds and other obligations of any agency (and such bonds and obligations shall so state on their face) shall not be a debt of the community, the state or any political subdivision thereof and neither the community, nor the state or any political subdivision thereof shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said agency. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction." The foregoing pronouncement by the legislature is so explicit as to show clearly that a state debt could not be incurred in connection with a redevelopment project; and further, as hereinbefore indicated, that a municipality could not exceed its debt limit except by establishing a "redevelopment revolving fund" in aid of such a project *provided* that the amount of such fund was first "submitted to and approved by the voters of such community at any general or special election."

The second question asks whether redevelopment agencies with the power of eminent domain violate article IX of the amendments of the Rhode Island constitution. In this instance we are clearly of the opinion that such agencies are not within the scope of that article, which, when adopted in 1892, took the place of sec. 17 of article IV of the constitution of this state. Taking into consideration its history, language and construction by this court in its original form it is clear to us that the intent and purpose of article IX of amendments was to impose more stringent limitations upon the legislature in the matter of granting the power of eminent domain to *private* corporations. See *State* v. *District of Narragansett, supra; Wood* v. *Quimby,* 20 R. I. 482, 485. This is not the case appearing in the present act. Here, as the act says, a redevelopment agency is a "public body, corporate and politic, exercising public and essential governmental functions," for the purpose of

promoting and protecting the public good. As thus defined in the act, such an agency is in effect a public or quasi governmental body which is not affected by the provisions of the article under consideration.

In order that we might more clearly present our views on the questions submitted, we have purposely cited in the body of this opinion only a few authorities in support of our conclusions. But among such authorities that we have examined the following are most pertinent: *Allydonn Realty Corp.* v. *Holyoke Housing Authority*, 304 Mass. 288, where in the course of its opinion the court distinguishes the case of *Salisbury Land and Improvement Co.* v. *Commonwealth*, 215 Mass. 371; *Matter of Murray* v. *LaGuardia*, *supra; Redfern* v. *Board of Comm'rs of Jersey City*, 137 N. J. L. 356; *Belovsky* v. *Redevelopment Authority of Philadelphia*, 357 Pa. 329; *Dornan* v. *Philadelphia Housing Authority*, *supra; Zurn* v. *City of Chicago*, 389 Ill. 114; *Cremer* v. *Peoria Housing Authority*, 399 Ill. 579; *People* v. *City of Chicago*, 399 Ill. 551; *Housing Authority* v. *Dockweiler*, 14 Cal. 2d 437; *Housing Authority* v. *Higginbotham*, 135 Tex. 158. See also annotations 130 A. L. R. 1069; 172 A. L. R. 966; 29 B. U. L. R. 318.

After serious consideration it is our opinion, that the act as amended and as herein construed and limited is for a public use or purpose and therefore does not violate any fundamental principle of constitutional law. Under our view of the act we answer the first question in the affirmative. Our answer to the second question is in the negative.

Antonio A. Capotosto

Hugh B. Baker

I entertain some doubts as to the constitutionality of the act under consideration. The primary purpose of the act appears to be to promote a redevelopment and use of land areas, to the end not only that such redevelopment and use may contribute to the elimination of conditions inimical

to public health, safety and welfare, but also to promote a better utilization of such areas from an economic standpoint so that "economical liabilities" may be removed, higher tax values may be created and greater revenues thus assured to the several municipalities of this state. The exercise of the taxing power and of the power of eminent domain is undoubtedly constitutional as to the first purpose, but in my mind is questionable as to the second. Also running throughout the act there appears a concomitant though perhaps not a predominant purpose, to ensure greater symmetry and a more aesthetic assembly of the areas taken and redeveloped under the act. This purpose and the achievement of such results, in so far as they are *merely incidental* to the lawful purpose of eliminating conditions inimical to public health, safety and welfare, do not in my opinion militate against the constitutionality of the act.

The act expressly provides that blighted areas, which it is sought to eradicate, are characterized by *one* or *more* of certain conditions enumerated in art. 2, sec. 2, paragraphs (a), (b), (c) and (d). The latter paragraph refers to areas in which there is a lack of proper utilization, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare. It is not necessary for the acquistion of land in some of the defined areas that such land actually constitutes a menace to public health, safety or welfare, which is a proper ground for the exercise of the power of eminent domain, since paragraph (b) of art. 2, sec. 2, expressly provides that such areas may include lands, buildings or improvements which of themselves are *not* detrimental to the public health, safety and welfare, but whose inclusion is found necessary, with or without change in their condition, for the effective redevelopment of the area of which they are a part.

Since the act provides that the existence of blighted areas characterized by *all* or *any* of the conditions enumerated

in paragraphs (a) to (d) inclusive constitute grounds for the exercise of the power of eminent domain, it follows that whenever the utilization of land in a given area does not meet its full economic potential it may be acquired under the power of eminent domain on the ground that failure to utilize such land in a manner calculated to achieve its highest economic potential stamps such land as a blighted area or a segment thereof and permits its acquisition against the consent of the owner or owners thereof.

In so far as the act would permit the acquisition of an integrated area, which contains only unproductive or stagnant land, or where there is merely an arrested development of such area, which constitutes no menace to public health, safety or welfare, I am of the opinion that such act is unconstitutional in that respect in that it would permit the acquisition of such area or any portion thereof, by the exercise of eminent domain and the expenditure of public money. But where such area is merely a part and not the whole of an area which the agency seeks to redevelop, and where such unproductive, stagnant or arrested area may constitute a menace to the public health, safety or welfare of the remainder of the area sought to be acquired, I am not prepared to state unequivocally that a taking under such circumstances is clearly unconstitutional.

Realizing that opinions of this nature are merely advisory, and not binding on this court, because they are not rendered in litigated cases, where the court has the benefit of the arguments and research of adversary parties, and being conscious of the well-settled rule of constitutional construction in this state and generally accepted in other jurisdictions, that courts should approach constitutional questions with great deliberation, exercising their power with extreme caution and even reluctance and that they should never declare a statute void unless its invalidity is, in their judgment, *beyond reasonable doubt,* I am con-

strained to concur, except as hereinbefore indicated, in the conclusion reached by Justices Capotosto and Baker, although I cannot concur fully with all of the reasons assigned for such conclusion.

While I entertain serious misgivings regarding various sections of the act I nevertheless find myself unable to say positively that it is unconstitutional beyond a reasonable doubt except as above stated. Such doubts as I may have are therefore, except in the particular above set forth, resolved, in accordance with the rule above referred to, in favor of the constitutionality of the act which is presented for the purpose of securing our advisory opinion.

JEREMIAH E. O'CONNELL

The first question should be answered in the negative and the second question in the affirmative since in my opinion the act is unconstitutional. Public laws 1946, chapter 1802, as amended by P. L. 1948, chap. 2029, and by P. L. 1949, chap. 2265, known as the community redevelopment act, hereinafter called the act, should not be confused with a so-called slum clearance act, or one based upon abnormal conditions of widespread distress created by an emergency or an acute shortage in housing, or one limited to a particular project and presently existing conditions or circumstances. It plainly provides, on a grand scale and under the most comprehensive plans and powers ever attempted in this jurisdiction, for future redevelopment of many areas coming within any one of the many conditions that may be found to constitute a so-called blighted or substandard area.

Only a careful study of the many interdependent provisions of the act can give an adequate understanding of the nature and extent of the legislative findings and the sweeping powers expressly granted. However, it is too long to be quoted in full and for our purposes some examples will be sufficient. Article 2, sec. 2, paragraphs (a), (b), (c) and (d) contain many elaborately stated findings by the

legislature "any one or more" of which conditions may constitute a blighted area requiring redevelopment. Accordingly in paragraph (a) "defective design and character of physical construction," or "faulty interior arrangement and exterior spacing," separately or in combination with other named characteristics may suffice to make the property "unfit or unsafe" for residential, commercial, industrial "or other purposes * * *." Such other purposes are not specified but evidently would include religious, educational and charitable uses.

Other such conditions in paragraph (b) include "An economic dislocation, deterioration or disuse" resulting from "faulty planning, the subdividing and the sale of lots of *irregular form and shape* and inadequate size for *proper usefulness and development,*" or "the laying out of lots in *disregard of the contours* and other physical characteristics of the ground and surrounding conditions * * *." (italics mine) And an area may be declared blighted even though, as expressly provided, it includes "lands, buildings, or improvements which of themselves are *not* detrimental to the public health, safety and welfare, but whose inclusion is found necessary, with *or without change* in their condition, for the effective *redevelopment* of the area of which they are a part." (italics mine)

Further, in paragraph (c), "A prevalence of depreciated values," or "*impaired investments* and *social* and *economic maladjustment*" resulting in "reduced capacity to pay taxes and consequent *inadequacy of tax receipts* in relation to the cost of public services rendered" thereby may be declared to constitute a blighted area. (italics mine) Significantly, the act elsewhere authorizes a sale for less than cost and does not *require* the owner to pay taxes assessed on the increased valuation of the redeveloped area. It authorizes, however, taxes as low in amount as the average of those received from the old area during the three years preceding the acquisition thereof.

In paragraph (d), a growing "lack of proper utilization of areas" which is found to result "in a stagnant and *unproductive* condition of land *potentially useful*" either separately or with other factors may justify the conclusion that it is a blighted area subject to eminent domain and redevelopment. (italics mine)

"Redevelopment" as defined in art. 3, sec. 15, includes among other meanings the following: "The term *does not exclude* the continuance of existing buildings or uses whose demolition and rebuilding or change of use are not deemed essential to the redevelopment and rehabilitation of the area. The term *includes* provision for open space types of use, such as streets and other public grounds and space around buildings, as well as buildings, structures and improvements, public *or private,* and improvements of recreation areas, public *or private,* and other public grounds." (italics mine) The term also includes "the *replanning* or *redesign* or *original development* of *undeveloped* areas which by reason of * * * *faulty lot layout* in relation to size, shape, *accessibility,* or usefulness, *or for other causes*" may be determined to be "stagnant or *not properly utilized*" and for any one of these "or other reasons" it may be held to require *replanning* and *development.* (italics mine)

In art. 3, sec. 5, a "redevelopment area" is defined as one which has been found to be blighted, and in need of *redevelopment* to effectuate the public purposes of the act. According to express provisions, such an area may include lands, buildings, or improvements "which of themselves *are not detrimental* to the public health, safety or welfare, but whose inclusion is found necessary, with *or without* change in their condition, for the *effective redevelopment* of the area of which they are a part." (italics mine)

Generally speaking, therefore, the primary purpose of the act is to provide a plan for future wholesale *redevelopment* and the powers necessary to effectuate it. As an incident to the furthering of such purpose of redevelopment the act also authorizes the taking of private property by a

legislatively termed public body for *any one* of the reasons, grounds or conditions referred to in the act; and such body is not required to hold, rebuild and redevelop the area taken but is empowered to serve as a mere conduit through which property may be taken by eminent domain from one person and transferred to another without necessarily restricting the latter's title or subjecting him to the obligation of providing, in accordance with fixed standards and regulations, a use or service properly deemed to be essential for the public as such or a function of government.

The controlling question, therefore, is whether redevelopment in accordance with such extreme, comprehensive powers and plans as set forth in P. L. 1946, chap. 1802, as amended, constitutes a public purpose, that is, a public use, within the fundamental principle of constitutional law. The "fundamental principle of constitutional law" thus stated in the propounded question relates of course to the provisions of the constitution of this state.

Article I, sec. 16, of the constitution of the state of Rhode Island, as a part of its bill of rights, provides that "Private property shall not be taken for public uses, without just compensation." While this is only a limitation upon the powers of the state and does not expressly prohibit the taking of private property, it is firmly established here, as elsewhere, that private property may be taken only for public purposes and by payment of just compensation. *In re Rhode Island Suburban Ry.*, 22 R. I. 457; *City of Newport* v. *Newport Water Corp.*, 57 R. I. 269, 275.

Whether a public use is desirable or necessary is for the legislature to decide as a matter of policy. But what constitutes a public use and whether such a proposed use violates the constitutional provision against taking private property are judicial questions for the ultimate determination by the court. *Narragansett Electric Lighting Co.* v. *Sabre*, 50 R. I. 288, 298; *In re Rhode Island Suburban Ry.*, *supra; Joslin Mfg. Co.* v. *City of Providence*, 262 U. S. 668. It is difficult perhaps to define public use precisely so that

it may be applied universally and uniformly to all conditions and circumstances. Consequently in the application of the definition of public use to particular circumstances prevailing in several jurisdictions under varying constitutional provisions, or at different times in the same jurisdiction, some confusion and apparent conflict has arisen. However, notwithstanding these difficulties in the application of the doctrine to new conditions or particular facts, it seems to me that the underlying principle by which a public use should be distinguished from a private use in the fundamental constitutional sense was intended to remain substantially fixed.

Generally speaking, the various decisions of courts in relation to what constitutes a public use so as to justify the exercise of eminent domain have been classified into two main groups. The first appears to hold to the principle that the prospective use of property taken from private persons must provide the general public, or an appreciable portion thereof, with the *right* to use or employ such property or at least to have it used or employed by some agency, public or private, in the public interest under appropriate regulations and restrictions, in order to provide the public as such with some service deemed to be necessary to it or to a proper function of government.

Running through most of the decisions in this category seems to be the thought that the taking should be necessary to some well-recognized and proper governmental function in the interest of the public as such; that the public use or service must be of right and not dependent on permission of the new owner; and that private property taken by eminent domain for a public use is affected, at least to some extent, with a public interest. Such interest has been described as being in the nature of a quasi trust for the benefit of the public as a whole. In other words, the courts in this group adhere substantially to the primary and natural meaning of the term "public use" and to the

fundamental principle relating to public use in the traditional constitutional sense.

The second group seems to hold that the term "public use" also has a *secondary* meaning which is substantially synonymous with public benefit, advantage, utility or convenience. Accordingly some courts have expressly held that whatever tends to benefit the public, even though only indirectly and in a general way, justifies a liberal extension of the meaning of public use to support the exercise of eminent domain; and that any use, for example, which tends to enlarge the resources, industrial energies, or productive powers of a number of inhabitants of the state, or to contribute to the welfare and prosperity of the community, is a public use in the constitutional sense.

It has been claimed that there is another or third group which seems to hold that the true interpretation of the term "public use" lies somewhere between the contrasting doctrines of the other two groups. However, some writers assert that such decisions really embrace the principle of the second group, differing only in a matter of the degree of public good or *public policy* which is found to be sufficient justification for its application.

Whatever may have been held elsewhere, Rhode Island appears to have adhered consistently to the primary meaning of the words "public use" and has applied substantially the traditional constitutional principle underlying public use as exemplified by the decisions generally included in the above-mentioned first group. In my opinion this classification has reasonable justification. According to Webster's New International Dictionary (2d ed.) 1946, p. 2005, the word "public" means: "Of or pertaining to the people; relating to, belonging to, or affecting, a nation, state, or community at large; — opposed to *private* * * * ." According to the same dictionary, page 2806, the verb "use" means: "To make use of * * * To convert to one's service; to avail oneself of"; and the noun "use" in its primary and usual sense means: "Act of employing anything, or

state of being employed; application; employment * * * The fact of being used or employed habitually * * * ." Moreover, according to that dictionary the noun "use" as particularly related to law conveys the idea of enjoyment through employment of property for the benefit of another, as something in the nature of a trust.

We find nothing in any of the several meanings found in the above-mentioned dictionary which entirely discards the concept of employment, and none which in my view satisfactorily supports the so-called secondary meaning as adopted and applied in many of the decisions classified in the second group. Therefore according to the dictionary it seems to me that the term "public use" in its primary and natural meaning contemplates some use or employment of property by the public, or a substantial portion thereof, or at least the right to have it thus employed. That concept is also supported by discussions of public use and eminent domain in various cases many of which are referred to in 14 Words and Phrases 324, 35 Words and Phrases 360, 18 Am. Jur. 660, §36, 2 Cooley's Const. Lim. (8th ed.) 1108, and 1 Lewis on Eminent Domain (3rd ed.) 505, §258.

Eminent domain is said to be an attribute of a sovereignty. It is a power, inherent or otherwise, in a soverign state whereby private property may be taken for public use without the owner's consent. The philosophy behind its origin and exercise seems to be definitely affixed or reasonably and substantially related to some necessity in order to aid and protect the proper functioning of government, through a governmental or other agency, in discharging its essential obligations to the public as such, or a substantial segment thereof. The early cases, decided nearer to the dates of the various constitutions, seem to adhere to the primary and natural meaning of the term "public use" and to the above-mentioned fundamental philosophy as to the exercise of eminent domain.

In more recent years, however, some courts appear to have adopted a so-called "liberal" view by expanding the meaning and extending the application of "public use" so as to support the exercise of eminent domain in cases which would not reasonably come within the primary meaning of public use. Many of such decisions seem to me to confuse that which may be merely beneficial or desirable as a matter of public policy with the constitutional meaning of public use and the requirements for the exercise of eminent domain. Others seem to stretch the meaning of public use in its application to a point where it becomes difficult in practice to distinguish any line of constitutional limitation.

But even in that connection it should be noted that there are still very few so-called acts for such wholesale *redevelopment,* as distinguished from special low rent housing or slum clearance, which have as yet been approved in a fully litigated case. In my opinion public use should not be confused with public policy or with mere general benefit or advantage to a community. Moreover, cases dealing with slum clearance or emergency conditions and those provided for by special constitutional provisions not present in our constitution are helpful but are not to be considered as binding authorities upon the instant question, namely, whether the *redevelopment* purpose in the instant act is a public use in the fundamental constitutional sense so as to justify the exercise of eminent domain.

In addition to the above considerations public use has been defined as "Anything which will satisfy a reasonable public demand for public facilities for travel, or for transmission of intelligence or commodities, and of which the general public under reasonable regulations will have a definite and fixed use independent of the will of the party in whom the title is vested is a public use." *Narragansett Electric Lighting Co.* v. *Sabre, supra.* By that definition the justices of this court plainly recognized and included the *right* of the public *to a definite and fixed use independent*

*of the will of the party in whom the title is vested* as essential to the legal concept of public use. In substance and effect, therefore, that definition conforms to the primary and natural meaning of the words "public use" and to the principle underlying eminent domain as adhered to in the decisions within the above-mentioned first group.

Moreover, the settled practice in Rhode Island further exemplifies this conclusion. When the state desired to take more property than might be needed for actual construction in the "establishing, laying out, widening, extending or relocating of public highways, streets, places, parks or parkways * * * ," it was evidently thought necessary to authorize eminent domain for such purposes by a special constitutional amendment. Article XVII of the articles of amendment to the constitution of this state was therefore adopted November 7, 1916. Moreover, in order to protect private ownership of property as guaranteed in the bill of rights that amendment significantly and expressly provided that the person or persons from whom the property was taken "shall have the first right to purchase or lease the same upon such terms as the state or city or town is willing to sell or lease the same," if it should be no longer strictly necessary for the public purpose supporting the original taking. In passing it may be noted that nothing of this kind has been done as to redevelopment nor are any such provisions found in the redevelopment act.

Finally a more recent case, *Opinion to the Governor,* 75 R. I. 54, concerned a particular housing project made necessary by the unusual widespread distress from conditions arising out of an emergency and acute shortage of housing. It was there pointed out in effect that in the absence of unusual and exigent circumstances the providing and rental of housing accommodations or of buying and selling houses by the exercise of the power of eminent domain and the expenditure of public funds therefor was a private and not a public use. We also noted that many things of a general and indirect benefit to the public through

their substantial relation to health and safety of individuals, such as food, fuel, clothing and other things equally necessary to maintain life, generally speaking, were not the subject of a public use or purpose so as to support the power of eminent domain, unless its exercise conformed to the powers granted, reserved, or limited in the constitution.

Further, we concluded that a mere legislative declaration that an emergency existed did not of itself create an emergency warranting the enactment of such legislation, and that it was a judicial question for this court to determine whether the legislature could reasonably consider the use to which the property is to be devoted as amounting legally to a public use. If it were otherwise it is evident, as there stated, that "a legislative declaration that a use is public when it is obviously private would conclude the question of the constitutionality of the act." *Opinion to the Governor, supra; Narragansett Electric Lighting Co.* v. *Sabre, supra.*

If these and other statements of the law concerning a public use under our constitution are sound, I think it follows *a fortiori* that redevelopment for the reasons and under the extreme powers granted in numerous interdependent provisions of the instant act should not be considered as a public use. When the provisions of the act are read as a whole, having in mind the many extreme legislative findings and the blanket provisions based upon any "one or more" of named conditions or for "other purposes" or "other reasons," it seems clear to me that many of the conditions asserted by the legislature as justifying eminent domain and redevelopment as a public use are obviously not warranted in fact; that the purpose of redevelopment as set forth in the act does not conform reasonably and substantially to the natural and primary meaning of the words "public use," the philosophy and principle underlying the exercise of the power of eminent domain, and the traditional constitutional view and established practice in this state as to eminent domain and what constitutes a public use; and

in any event that the extreme powers for *redevelopment*, which is the primary or at least the dominant purpose of the act, are not reasonably and substantially related to any continuing and independent right of the public as such to use the property thus taken or to have it employed, under appropriate regulations and restrictions, to provide services deemed necessary for the public or to effectively carry out some proper function of government.

In my opinion the dominant purpose of the act, the findings of fact and the grant of extreme powers by the legislature are manifestly clear, unequivocal and comprehensive. Obviously they were so intended and therefore the act requires no construction on our part. Nor is it our duty, as I view it, to attempt to separate the many interdependent provisions by interpretation and restriction. The act as passed, amended and approved is the basis for the proposed questions and my view is predicated thereon.

My conclusion has been reached reluctantly because an act of a coordinate department of the government is entitled to due consideration and should not be disturbed unless it violates constitutional principles beyond a reasonable doubt. However, after a review of many pertinent authorities in the light of definitions, opinions and practice relative to public use and eminent domain in Rhode Island, it seems to me beyond a reasonable doubt that the prospective purpose or use for redevelopment as set forth in the instant act does not constitute a public use in the fundamental constitutional sense so as to justify the exercise of the power of eminent domain.

This view also is amply supported by many cases from other jurisdictions. For example, in the *Opinion of the Justices,* 204 Mass. 607, the question related to the taking of private property to insure the proper development of industrial facilities. It was there held that such purpose was primarily for the benefit of individuals and only incidentally for the promotion of the public weal. Accord-

ingly it was not considered a public use in the constitutional sense.

In another case the justices of the same court held that the legislature had no power to authorize the use of public money to purchase and develop land for the purpose of providing homes for "mechanics, laborers, or other wage-earners," or for the purpose to improve "the public health by providing homes in the more thinly populated areas of the State for those who might otherwise live in the most congested areas of the State." In that opinion the court further stated: "If the power exists in the Legislature to take a tract of land away from one owner for the purpose of enabling another to get the same tract, the whole subject of such ownership becomes a matter of legislative determination and not of constitutional right." *Opinion of the Justices,* 211 Mass. 624, 625, 629. To a similar effect see also *Salisbury Land and Improvement Co.* v. *Commonwealth,* 215 Mass. 371, and cases there reviewed and cited.

In *Healy Lumber Co.* v. *Morris,* 33 Wash. 490, 509, the court was considering the general subject matter of eminent domain and used the following language: "the use under consideration must be either a use by the public, or by some agency which is quasi public, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity of the state."

A similar thought has been stated as follows: "Different courts sometimes arrive at different conclusions upon the same state of facts, but whenever the remedy is applied, it should always be because there is a direct 'public use' of the property taken, and not a mere incidental or indirect public benefit." *City of Richmond* v. *Carneal,* 129 Va. 388, 398.

Likewise in *Smith* v. *Cameron,* 106 Ore. 1, the court points out by way of distinction different special provisions in the constitutions of certain other states and cites with approval the following expression from Cooley's Const. Lim. (7th ed.) 766: " 'The public use implies a possession, occu-

pation, and enjoyment of the land' by the public or public agencies, and it is not enough 'that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises.' "

For similar expressions and conclusions concerning the meaning of public use and eminent domain in the constitutional sense, see also *Fountain Park Co.* v. *Hensler,* 199 Ind. 95; *Connecticut College for Women* v. *Calvert,* 87 Conn. 421; and many others which are referred to in 14 Words and Phrases 324; 35 Words and Phrases 360; 18 Am. Jur. 660, §36; 2 Cooley's Const. Lim. (8th ed.) 1108; 1 Lewis on Eminent Domain (3d ed.) 505, §258; 10 R.C.L. 24, §22; 27 A.L.R. 510; 50 A.L.R. 1518.

On the other hand, the courts in some states appear to have applied a different doctrine. They seem to me to treat "public use" as synonymous with either public policy or with a public benefit, advantage, utility or convenience. At least they stretch the meaning of "public use" to an extent that makes it difficult to have any reasonably fixed standard by which the question what constitutes a public use may be determined constitutionally. They are included in the second above-mentioned groups, and the cases of *Dornan* v. *Philadelphia Housing Authority,* 331 Pa. 209, *Belovsky* v. *Redevelopment Authority of City of Philadelphia,* 357 Pa. 329, and *Zurn* v. *City of Chicago,* 389 Ill. 114, represent that view.

However, I am not convinced that we should follow the reasoning or results enunciated therein. They are helpful but it should be noted that few, if any, of them are cases under a redevelopment act like ours and that all of them are litigated cases in equity where the particular project and issues are defined. Apart from that the thought seems to prevail, according to certain assertions and reasoning, that unless the words "public use" are given a so-called liberal meaning to conform with a declared public policy of the legislature, the community will be impotent or de-

prived of desirable advantages or benefits that might flow generally and indirectly from the exercise of eminent domain. Neither of these conclusions follows. In that connection the legally sound answer in my opinion is found in the practice and experience in the state of New York. Apparently the constitutional difficulties in trying to thus expand the meaning of the words "public use" beyond their primary meaning and the fundamental principle of constitutional law, in order to fit comparable proposed uses, were clearly and fully recognized in that state. Consequently in 1938, after an exhaustive study of the related problems, an appropriate amendment to the New York constitution was found to be the safe and sound procedure in order to insure the benefits of redevelopment, which at least in part are similar to the redevelopment here involved. See *Murray* v. *LaGuardia,* 291 N.Y. 320.

In the circumstances I prefer to follow what appears to be the weight of authority here and elsewhere and thus to recognize and approve the experience, procedure and decision in New York. See *Murray* v. *LaGuardia, supra.* That and other similar cases seem to me to conform substantially to the statement on eminent domain and public use to be found in 1 Lewis on Eminent Domain (3d ed.) 506, §258, which reads in part as follows: "The public use of anything is the employment or application of the thing by the public. * * * The reasons which incline us to this view are: First, That it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier constitutions; third, it is the only view which gives the words any force as a limitation or renders them capable of any definite and practical application. If the constitution means that private property can be taken only for use *by* the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public

retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use and the act of appropriation is void. * * * If exceptional circumstances require exceptional legislation in those respects in any State, it is very easy to provide for it specially in the constitution, as has been done in several States."

It is my opinion, therefore, that the redevelopment act, when considered as a whole in the light of all the reasons and authorities hereinbefore set forth, is unconstitutional. It follows that the first question propounded should be answered in the negative and the second question should be answered in the affirmative.

EDMUND W. FLYNN

My study of this act has convinced me beyond a reasonable doubt that it authorizes the taking of private property for the express purpose of an ultimate private use and therefore violates article I, sec. 16, of the declaration of rights of the constitution of this state. *Narragansett Electric Lighting Co.* v. *Sabre,* 50 R. I. 288, 298. I am also of the opinion that it is constitutionally invalid because it expressly authorizes the use of public money raised by taxation for an ultimate private purpose.

In view of the analysis of the act in the majority opinion there is no need of a further exposition of its purposes and procedures here. The act is most comprehensive in vesting power in the redevelopment agency to take private property, clear the land of its improvements, relocate streets, assemble lots into larger tracts, replat and do other things necessary to prepare the cleared land for sale or lease to private persons or corporations who will agree to use it in accordance with such conditions and restrictions as the agency may prescribe pursuant to the express mandate of the act. It is, indeed, a far-reaching piece of legislation. That the draftsman of the act deliberately intended it to be so is apparent

from its many sweeping and repetitive provisions. Certainly the legislature could not have failed to discern the ultimate design of the act and the comprehensiveness of the powers conferred upon the agency to effectuate such design. This being so, the only question for judicial determination is whether the legislature might reasonably find that such clear design of the act was a public use and therefore not within the inhibition of the declaration of rights that private property should not be taken except for a public use and upon just compensation. It is because I am firmly convinced that the legislature could not reasonably so find that I am constrained to differ with my brethren who subscribe to the contrary view.

I am fully aware of the rule of construction that courts should not declare legislative acts unconstitutional unless they are convinced beyond a reasonable doubt, and I realize that I am bound by that rule in giving my opinion here. I am also conscious of the fact, however, that to declare an act of the legislature unconstitutional is, to say the least, an extremely disagreeable duty. This is especially so where an act "because of some accident of immediate overwhelming interest," as was said in the dissent in *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400, "appeals to the feelings and distorts the judgment." Nevertheless the court must accept this grave responsibility and "when it is clear that the statute transgresses the authority vested in the Legislature by the Constitution, it is the duty of the court, a duty from which they cannot shrink without profaning their oaths of office, to see and to declare the invalidity of the statute." *Salisbury Land and Improvement Co.* v. *Commonwealth,* 215 Mass. 371, 373. Such clearness in the statute in question is apparent to me notwithstanding the doubts of some of my brethren, and, therefore, I am constrained to differ with them. A decent respect for their opinions requires me to state as briefly as I may the reasons which impel me to this divergent view.

In the first place it is essential to keep in mind that this act is in no sense a *regulatory* statute based upon the exercise of the police power. It does not aim to regulate the use of private property but expressly authorizes the seizure of such property under the guise of necessity for a public use. This is an exercise of the power of eminent domain. These are two separate and distinct powers and rest on entirely different principles. *Horton* v. *Old Colony Bill Posting Co.*, 36 R. I. 507. The application of the police power to the activities of business is confined to regulating such activities and does not extend to authorizing the state to engage in them. *State of Ohio* v. *Helvering*, 292 U. S. 360.

The acquisition of real estate and its renovation, improvement or redevelopment for the professed purpose of sale or lease to private persons is, therefore, not an exercise of the police power. But the proponents of the act nevertheless say it is valid because the land and the improvements thereon which are to be seized or otherwize acquired must be cleared and redeveloped to eradicate evils which inhere in or are necessarily incidental to such property in its present condition and which are detrimental to the public health, safety and morals. The short answer to their assertion is that even though such evils exist the police power furnishes no warrant for the *seizure* of the offending property.

The remedy is to hold the owner responsible for the illegal use which he makes or permits to be made of his property. In the event of his neglect or refusal to abate the alleged nuisance the authorities may abate it and charge the cost to him. Of course, in such a case they must be prepared to show that such evil or evils did in fact exist. This obligation, however, under the police power would also rest upon the redevelopment agency, even under this act, since their findings that any particular area was inimical in its existing condition to public health, safety or morals would be subject to judicial review premised upon the legislative policy as declared in article 2, sec. 2, of the act. *Treigle* v. *Acme Homestead*, 297 U. S. 189. The police

power confers "no unrestricted authority to accomplish whatever the public may presently desire." *Panhandle Eastern Pipe Line Co.* v. *State Highway Comm'n,* 294 U. S. 613, 622.

Hence it is obvious that what the legislature has attempted under this act is to exercise two governmental powers in combination. Recognizing the inadequacy of the police power alone as a constitutional basis for the comprehensive provisions of the act, it has called upon its power of eminent domain by declaring that the taking of private property by the development agency under the act is for a public use. That declaration does not of itself determine the nature of such use. This is ultimately a judicial question. Here we must look behind the words to discover the actual use to which the property is to be put. In other words, it is not the immediate occasion of the taking that determines the nature of the use but the ultimate purpose to be served by such taking. That purpose is unquestionably for the same kind and character of private use as existed before the taking of the property, but without the evils attendant upon the prior private use. Some courts have held in passing upon similar legislative acts that such ultimate private use is only incidental to what they call the primary public use of eliminating certain evils which were found to be accompanying the prior private use and to be inimical to the public health, safety or morals. Prescinding from that view they state that the ultimate private use of the condemned property being only incidental to the taking of it for the elimination of public evils does not detract from what they term the primary public use.

I cannot accept such view. In my opinion it confuses the *taking* of the condemned property with the *use* to which it is designedly to be put. The taking is admittedly a public act and were the property intended to remain in the public for the purpose of providing parks, playgrounds, widened or straightened public highways for traffic relief,

or for any other familiar type of public welfare projects definitely tending to promote the public health, safety or morals I would have no hesitancy in finding the intended use public. But here, aside from the elimination of the evils found to be attendant upon the prior private use of the property, the professed intention of the statute is to provide for the return of the property to private use unaccompanied by any use or right of use by the public generally.

This is quite unlike the act which was under consideration in *Moore* v. *Sanford*, 151 Mass. 285, where the primary object of the taking of the land was the development of Boston Harbor in order to promote cooperation between the various facilities engaged in foreign and domestic commerce. It is more like the situation that was passed upon in the *Opinion of the Justices*, 204 Mass. 607, which concerned a proposed plan of taking by eminent domain private property adjoining the layout of a widened public thoroughfare and leasing it to private interests for the purpose of erecting improvements subject to certain prescribed conditions designed to promote the public interests and objects for which the thoroughfare was to be constructed. Whether such limited use of lands outside the highway was a public use which would justify the exercise of the power of eminent domain the opinion advised at page 610: "The city cannot be authorized to take the property of a private owner for such a purpose, nor can the city tax its inhabitants to obtain money for such a use."

But perhaps a closer case is *Salisbury Land and Improvement Co.* v. *Commonwealth, supra,* where a statute set up a park commission with power of eminent domain to take over a beach and adjoining property for the purpose of a park reservation. The act also contained broad powers authorizing the park commission to resell some of the property even though it continued within the territorial limits of the park. Holding the act invalid, the court said at page 377: "Legislation which is designed or which is so framed that it may be utilized to accomplish the ultimate result of placing

286

property in the hands of one individual for private enjoyment after it has been taken from another individual avowedly for a public purpose is unconstitutional. It would enable that to be achieved by indirection which by plain statement would be impossible." This constitutional guaranty against the taking of private property except for a public use, it has been said by the supreme court of the United States, "grows out of the essential nature of all free governments" and "is fundamental in American jurisprudence." *Madisonville Traction Co.* v. *Saint Bernard Mining Co.,* 196 U. S. 239, 251.

We, ourselves, very recently advised that under our state constitution the state cannot engage in the buying and selling of land under the guise of exercising the power of eminent domain. *Opinion to the Governor,* 75 R. I. 54. And this view is consistent with the rule of law earlier announced by this court when it stated that the legislature had no power to take A's vested estate or any part of it and transfer it to B for private use, and *any circuity of proceeding in doing it will not defeat A's right. Talbot* v. *Talbot,* 14 R. I. 57. And it has been expressly held elsewhere that where the property to be taken for an admittedly public use is not to be retained for such purpose but is to be resold for private use it is not a valid taking for a public use. *Pennsylvania Mutual Life Ins. Co.* v. *Philadelphia,* 242 Pa. 47.

Perhaps the whole difficulty in this matter is the conception entertained by various courts of the term "public use" as employed in the federal constitution and practically all state constitutions. Formerly there was virtual uniformity in the judicial interpretation of that term along the line that it meant actual use or right of use by the public of the property taken. Latterly, however, there has been a definite departure from such interpretation tending to make it mean merely some public benefit or advantage flowing indirectly from the taking without actual use or right to use on the part of the public.

In *Narragansett Electric Lighting Co.* v. *Sabre, supra,* this court, however, adopted the following statement in 20 C. J. 556, note (j): "Anything which will satisfy a reasonable public demand for public facilities for travel, or for transmission of intelligence or commodities, and of which the general public under reasonable regulations will have a definite and fixed use independent of the will of the party in whom the title is vested is a public use." See also 29 C. J. S. Eminent Domain §31, note 36. Earlier, however, some courts were already stretching this concept so that Potter, J., dissenting in *Boston & Providence R. Corp.* v. *New York and New England R. R.,* 13 R. I. 260, 285, was led to observe: "The logical outcome of many of the decisions and *dicta* on this subject of sacrificing private rights to a very slight public advantage is communism * * *." And earlier in his opinion he stated at page 278: "It is an enormous arbitrary power to seize the property of the citizen without or against his will, and apply it to public uses. But it *must be for the public use,* and for the *use of the people* of this State." (italics mine)

The question now is on which side shall this court be clearly ranged. I believe that it should continue to be on the side of the traditional interpretation of the term "public use" and not on the side of a loose construction. The reason for this conclusion, in my opinion, has been well stated by the court of appeals of Maryland in *Arnsperger* v. *Crawford,* 101 Md. 247. Referring in that case to the two divergent views of the term which had arisen among various courts they said at page 253: "There will be found two different views of the meaning of these words which have been taken by the Courts; one, there must be a use, or right of use *by* the public, or some limited portion of the public; the other that they are equivalent to *public utility or advantage.* If the former is the correct view, the Legislature and the Courts have a definite, fixed guide for their action; if the latter is to prevail, the enactment of laws upon this subject will reflect the passing popular feeling,

and their construction, will reflect the various temperaments of the Judges, who are thus left free to indulge their own views of public utility or advantage." For those reasons that court chose to adhere to the former view as the correct one.

Such is the choice which we are called upon to' make in giving our opinions on the act here in question. It is a choice, in my opinion, fraught with grave consequences to the continuance of free government as we have known it and as the founding fathers sought, by explicit provisions in the bill of rights, to guarantee and preserve. The question involved is one of freedom. "The security of property, next to personal security against the exertions of government, is of the essence of liberty. They are joined in protection * * * and both the National Government * * * and the States * * * are forbidden to deprive any person 'of life, liberty, or property, without due process of law,' and the emphasis of the Fifth Amendment is that private property cannot be 'taken for public use, without just compensation.'" McKenna, J. dissenting in *Block* v. *Hirsh,* 256 U. S. 135, 165.

At first blush it may seem extravagant to attribute such transcendent importance to the simple issue presented here, but I am confident that upon mature reflection its supreme importance will become more and more evident. We would do well to pause long and ponder earnestly before approving legislation which so clearly undertakes to authorize the seizure of private property of one person and its transfer to another. It was for the purpose of curbing governmental power that express protection to private property was written into the declaration of rights in our state constitution. The supreme court of the United States has well said in this connection: "Due protection of the rights of property has been regarded as a vital principle of republican institutions. 'Next in degree to the right of personal liberty,' Mr. Broom in his work on Constitutional Law says, 'is that of enjoying private property without undue interference or

molestation.' The requirement that the property shall not be taken for public use without just compensation is but 'an affirmance of a great doctrine established by the common law for the protection of private property. It is founded in natural equity, and is laid down by jurists as a principle of universal law. Indeed, in a free government almost all other rights would become worthless if the government possessed an uncontrollable power over the private fortune of every citizen.' " *Chicago, Burlington & Quincy R.R.* v. *Chicago,* 166 U. S. 226, 235.

We are dealing here with the very cornerstone of our free society. If this guaranty of the right of private property against the arbitrary exactions of government is lost, then all is lost. No matter how beneficent legislation may at the moment appear to be it will be dear, indeed, if purchased at such a price. There are many things a benevolent despotism may do for the material well-being of its subjects that are denied to a constitutional democracy of free citizens, but the cost is loss of freedom and citizenship.

The people in their sovereign capacity of course may yield this right guaranteed to them under the constitution, if they so choose. But neither the legislature nor this court may directly or indirectly do so. If the objectives of the act under consideration are impossible of accomplishment under the constitution as it now stands, and if those objectives are so desirable and beneficial that the people are willing to surrender some portion of their guaranteed right of private ownership of property so that the government through the legislature may authorize the taking of such property for a use that is not truly public they may amend the constitution to permit the realization of those specific objectives. In this way it would be possible for them to restrict such surrender of their constitutional rights so as to extend it no farther than necessary to achieve those ends. Such was the method adopted in 1916 when the people were apparently convinced that the permissive authority specifically granted to the state under article

of amendment XVII was desirable. That article reads as follows:

"Section 1. The general assembly may authorize the acquiring or taking in fee by the state, or by any cities or towns, of more land and property than is needed for actual construction in the establishing, laying out, widening, extending or relocating of public highways, streets, places, parks or parkways: *Provided, however,* that the additional land and property so authorized to be acquired or taken shall be no more in extent than would be sufficient to form suitable building sites abutting on such public highway, street, place, park or parkway. After so much of the land and property has been appropriated for such public highway, street, place, park or parkway as is needed therefor, the remainder may be held and improved for any public purpose or purposes, or may be sold or leased for value with or without suitable restrictions, and in case of any such sale or lease, the person or persons from whom such remainder was taken shall have the first right to purchase or lease the same upon such terms as the state or city or town is willing to sell or lease the same."

It will be noted that there the people even in the very act of constitutionally surrendering a portion of their rights jealously safeguarded some measure of them by expressly providing that the owner from whom the land or property was taken should have a preferred right to purchase or lease such land or property in the event that all of it was not needed for the particular public use specifically described in the amendment.

The procedure there followed besides being the only constitutional way to effectuate the desired result, also avoids the danger of erosion of the right of private property by the process of loose judicial interpretation unconsciously affected as it may well be by momentary popular clamor. Reluctant as I am to delay the realization of the benefits which may flow from this seemingly worthwhile but clearly invalid legislation, I am in duty bound to do so out of respect to the constitution and my oath of office. If I did otherwise I would be recreant to both and be guilty of

usurpation of the people's prerogative to amend their constitution. Furthermore I am profoundly of the opinion that unless this court resists what the late Mr. Justice Holmes called "the hydraulic pressure" of statutes so naturally appealing in their humane and civic aspects as the one here in question this great guarantee of the declaration of rights in our state constitution protecting the right of private property will soon live only in rhetoric.

My considered opinion is, therefore, that the act in question is unconstitutional on the grounds first hereinbefore mentioned.

FRANCIS B. CONDON