Argued December 2, 1952, affirmed April 29, 1953

# FOELLER ET UX. *v.* HOUSING AUTHORITY OF PORTLAND

256 P. 2d 752

*Thomas H. Ryan,* of Portland, argued the cause and filed a brief for appellants.

*Verne Dusenbery* and *William C. Martin,* of Portland, argued the cause for respondent, Housing Authority of Portland. On the brief were Dusenbery, Teiser, Martin and Schwab, of Portland.

*Helen F. Althaus,* Deputy City Attorney, argued the cause for respondent, City of Portland. With her on the brief were Alexander G. Brown, City Attorney, and Marian C. Rushing, Chief Deputy City Attorney, all of Portland.

Before BRAND*, Chief Justice, and HAY***, ROSS-MAN, LATOURETTE**, WARNER and TOOZE, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a decree in favor of the defendants, which the circuit court entered after it had sustained a motion made by them for judgment in their favor upon the pleadings. The proceeding was instituted pursuant to the provisions of our Declaratory Judgments Act. Its main purpose was to secure a ruling as to the validity of Oregon Laws 1951, ch 373, which the parties term the Urban Redevelopment Law. The attacked decree sustained that statute as valid.

The plaintiffs (appellants) are the owners of an item of real property which is situated in a part of the city of Portland known as the Vaughn Street or Northwest Area. We will term it the Vaughn Street Area and will later describe it. The defendants are the City of Portland and the Portland Housing Authority. The latter is a public agency which was created under § 99-2004, OCLA, as amended by Oregon Laws 1941, ch 336, and a resolution adopted by the city's council complementary thereto. The agency possesses the authority specified in the aforementioned Urban Redevelopment Law and in (a) Housing Authorities Law, §§ 99-2001 to and including 99-2023, OCLA, as amended by Oregon Laws 1941, ch 336, Oregon Laws 1949, ch 130, and Oregon Laws 1951, ch 118; and (b) the Housing Cooperation Law, §§ 99-2024 to and including

---

* Chief Justice when this case was argued.
** Chief Justice when this opinion was rendered.
*** Deceased December 19, 1952.

99-2030, OCLA. The complaint incorporates within itself a resolution which was adopted by the city's council January 23, 1951, and one which was adopted by the Housing Authority September 20, 1951, both as preludes to the city's eventual engagement in urban redevelopment and for the additional purpose of securing federal financial assistance under Title I of the Housing Act of 1949 (42 USCA, §§ 1441-1460). The first of the resolutions expressed a finding that it was ''necessary and in the public interest'' that Portland should undertake ''an effective program of slum clearance and urban redevelopment'' and that preparatory work be entered upon with reference to areas mentioned in the resolution. Continuing, the resolution petitioned the administrator of the Housing and Home Finance Agency of the Federal Government to reserve capital-grant funds of $1,412,880 for use in the contemplated redevelopment work. The resolution adopted by the Housing Authority, after noting that the Urban Redevelopment staff of the Housing Authority and the Urban Redevelopment Advisory Board had found that the Vaughn Street Area called for redevelopment work, resolved that ''the Vaughn Street Area be and the same is hereby adopted as the area in which an 'Urban Redevelopment' project should be located.''

It will suffice for present purposes to state that the Vaughn Street Area, 44 blocks in extent, lies northwesterly from the central business section of Portland. As we shall presently show, it is deemed by the Housing Authority a blighted area, as that term is defined in § 2(1) of the Urban Redevelopment Law. The plaintiffs' property, which is a dwelling house, is not dilapidated nor substandard. The complaint, after averring that the city ''obtained a reservation of funds

in the amount of $1,412,880 by the Federal Housing and Home Finance Agency'', states:

"Pursuant to said statutes and pursuant to the said resolution of the defendant City, the defendant Housing Authority proposes to and will, unless restrained by this court, carry out a slum clearance and urban redevelopment project within"

the Vaughn Street Area. The prayer of the complaint seeks a declaratory judgment, holding "unconstitutional and void" the Urban Redevelopment Law, the Housing Authorities Law, the Housing Cooperation Law and the two aforementioned resolutions

"insofar as said Statutes and Resolutions purport to authorize the actions and things which have been set forth herein, and insofar as they purport to authorize the acquisition of property in the said northwest area by the exercise of the power of eminent domain, * * * the expenditure of tax revenues of the City of Portland as a cash grant-in-aid of the redevelopment of said area, the disposition by sale or lease of the property located in said area after the acquisition and improvement thereof * * *."

As we have said, the attacked judgment was entered after the court had sustained a motion made by the defendants for the entry of judgment upon the pleadings. The latter, apart from the complaint, consisted of answers filed by the city and the Housing Authority. The answers admitted virtually all of the averments of the complaint with the exception of those which construed the statutes and ordinances which we have mentioned and which pled that they are unconstitutional. The answers contained affirmative averments which we will presently review.

The six assignments of error challenge the validity of the Urban Redevelopment Law by submitting these

contentions: (1) The act contains more than one subject in violation of Art. IV, § 20, Constitution of Oregon; (2) it constitutes class legislation in violation of Art. I, § 20, Constitution of Oregon; (3) in disregard of Art. I, § 18, it permits the taking of property for purposes that do not constitute "public use"; (4) it attempts a delegation of legislative powers contrary to Art. III, § 1, and Art. IV, § 1, Constitution of Oregon; (5) in violation of Art. XI, § 9, it aids private individuals with public funds and credit; and (6) it violates Art. I, § 20, by favoring one class over others.

The facts are free from dispute and we shall now note those which we have not already mentioned.

After the city had adopted its aforementioned resolution, the Portland Planning Commission studied the several areas mentioned in that resolution and found that three of them called for redevelopment. One of the three was the Vaughn Street Area. Still later, the Housing Authority and a public body entitled the Portland Redevelopment Advisory Board made a survey of the three areas. The Portland Redevelopment Advisory Board was organized under Oregon Laws, 1951, ch 373, § 8, and consists of 39 residents of the city having the qualifications demanded by that statute. After it had completed its work, the advisory board reported to the Housing Authority that the Vaughn Street Area was a blighted area within the contemplation of the Oregon and federal redevelopment statutes. It recommended that the area be selected for redevelopment. Thereupon the Housing Authority adopted the resolution which chose the Vaughn Street Area for redevelopment. Further, it directed its staff to make a detailed study and survey of the area "for the purpose of defining and

locating an Urban Redevelopment project therein."
At the conclusion of that investigation, the Housing
Authority, on June 19, 1952, adopted a resolution, the
material parts of which are:

"(a) The Vaughn Street Area was developed
as a residential district more than fifty years ago.
It was platted with streets 60 feet in width, and
with lots varying in width from 20 feet to 50 feet,
and substantial portions of the area were built up
without reference to any requirements or standards
relating to main access to structures; front, rear
or side yards; minimum lot areas or maximum
building coverage. The district reached its peak as
a residential area about 1910 and has been in con-
tinuous decline since that time. The average age
of the dwelling structures is 52 years, and only
nineteen new dwelling structures have been built in
the area within the past thirty years.

"(b) For the past forty years, and particu-
larly during the past twenty-five years, the area
has been undergoing a change from residential to
industrial and commercial uses, and all of the area
except a narrow strip south of Thurman Street
is zoned as industrial property. The filling of
Guilds Lake which was located northwesterly of
the project area, * * * stimulated an intensive
industrial development in the vicinity of the area
extending along the west bank of the Willamette
River. The industrial growth has proceeded con-
tinuously, with the result that the area is now
completely surrounded on three sides by industrial
and commercial establishments, and during the past
twenty-five years has existed only as a residential
peninsula jutting into an exclusively industrial
district.

"(c) The area itself, in addition to being sur-
rounded on three sides by industrial enterprises,
has been penetrated by industry and commerce to
such an extent that at this time only 53.8% of
the area is used for residential purposes, 18.7%

is vacant, and the remaining 27.5% is occupied by various industrial and commercial establishments.

\* \* \*

"The non-residential establishments are scattered promiscuously throughout the area. Of the 44 blocks comprising the project area, 9% are exclusively residential, 5% are exclusively non-residential, and the remaining 86% are occupied by dwelling structures intermingled with commercial and industrial establishments. Because of the mixed pattern of use the residential structures are in close proximity to industrial and commercial activities with resulting exposure to the noise, dust, smoke, fumes, vibration and general bustle and confusion incident to such activities. \* .\* \*

"(d) The industrial penetration of the area which was platted and designed only for residential use has resulted in unusually heavy railway, truck and automobile traffic congestion. Two heavy traffic streets, Vaughn and Thurman, cross the principal part of the area from east to west. Highway traffic counts have shown as many as 28,860 vehicles entering the area in a normal 24-hour period. Off-street parking facilities are limited and the area is congested with on-street parking. As many as 1200 passenger cars parked in the streets have been counted in the area on a typical work day. Congestion is further increased by railroad spur trackage of 3750 linear feet which cross the area from east to west and from north to south, and over which cars are moved in and out by switch engines and spotted in the area for loading and unloading. In a large part of the area the curbing between the street and the sidewalk has disappeared in order to facilitate the loading and unloading of trucks and trailers and to give more ready access to the industrial and commercial establishments, \* \* \*.

"(e) The industrial plants located in and adjacent to the area which include steel foundries, paint manufacturing establishments and trucking

terminal yards, subject the area to an unusual amount of noise, fumes, smoke and vibration. These are enhanced by the heavy diesel traffic in the area and extensive railway switching operations.

"(f) All of the detached dwelling structures in the area and all but a few of the multiple dwelling structures are of wooden construction, and the infiltration of industrial and commercial establishments into the area and among the dwellings has subjected the residents to unusual fire hazards. The industrial plants in close proximity to residences include two paint manufacturing establishments, one foundry-forge machine works housed in a building constructed of wood, and an excelsior plant housed in a building of like construction. The records of the Portland Fire Department show that for 1950 fire calls per structure in the area were 100% greater than the average for the City as a whole.

"(g) The residents of the area are subjected to unusual traffic hazards. All of the service facilities, the schools used by the children in the area, all churches except one, and all community facilities, are located either on the south boundary of the area or south of the area altogether, so that it is necessary that the residents cross at frequent intervals the heavy east-west traffic arteries of Vaughn and Thurman Streets. Since 50% of the school children live north of Vaughn Street they must cross both Vaughn and Thurman Streets in going to and from the Chapman School which is located two blocks south of the district and is the public grade school serving the area. * * *

"(h) The Vaughn Street Project Area as a residential district is physically substandard and economically deteriorated. A substantial majority of the residential properties situated in the area do not conform to the minimum requirements of the housing and building codes of the City of Portland in that the dwelling structures themselves are either of inadequate original construction, or are deteri-

orated or dilapidated, or the land areas occupied by the dwelling structures are inadequate to meet minimum code requirements. According to the house-by-house survey * * * 85.3% of the dwelling structures in the area are substandard as measured by the building codes of the City. A comparison as to assessed valuation between average residential properties located in four parts of the project area with similar residential properties located south of the area and comparable in all essentials except as to location, revealed a 42% lower assessed valuation within the project area. The normal sources of home mortgage financing are not readily available upon residential property within the area. Direct loans from life insurance companies and savings and loan associations and FHA insured mortgage loans upon residential properties within the area are difficult, if not impossible to obtain.

"(i) The population of the area consists of 971 families living in 474 structures which are 53% owner-occupied. The rental units occupied by 47% of the population and averaging 1.9 rooms per family are predominantly of the 'light housekeeping' type. the average monthly contract rent is $35.65.

"(j) The area is devoid of parks, playgrounds and play areas, and as hereinabove alleged the residents are without ready access to such facilities located outside of the area. The incidence of juvenile dependency (where custody of minors is changed by court order for neglect or dereliction of parents, juvenile delinquence (where minors are brought into court for law violation), and crime, is excessive in the Vaughn Street Area. As shown by the juvenile court records of Multnomah County, the rate in the area for juvenile dependency per 100,000 minors under 20 years of age is approximately double that of the City as a whole, and the rate in the area for juvenile delinquency per 100,000 minors under 20 years of age is more than 7.5 times that of the City as a whole. While the population of the

area contains many upright, law-abiding citizens, including the plaintiffs in this case, the records of the Portland Police Department show that the rate of crime (excluding traffic violations) for the area is more than 8 times that of the City as a whole.

"Now, Therefore, Be it resolved by the commissioners of the Housing Authority of Portland, Oregon:

"1. That the Housing Authority hereby finds and determines that the Vaughn Street Redevelopment Area, by reason of the facts and circumstances herein found to exist with respect to the real property and improvements and structures comprising the same, is detrimental to the safety, health, morals and welfare of the communty, and should be eliminated as a residential district.

"2. That the Housing Authority further finds and determines that by reason of the facts and conditions herein found to exist, the Vaughn Street Redevelopment Area is a 'blighted' area as defined by Section 2(1) of the Oregon Redevelopment Law."

The complaint avers that the city, in pursuing the redevelopment work in the Vaughn Street Area, "will provide the local grants-in-aid necessary to obtain the federal financial assistance" in the amount of $1,412,-880 which we have mentioned, and that the Housing Authority, unless restrained, will acquire, either by purchase or the exercise of the power of eminent domain, all of the property in the Vaughn Street Area "with the exception of a small number of commercial and industrial properties." After its acquisition of the properties, the Housing Authority, according to the plaintiffs, will take the following course:

"* * *

"B. * * * demolish all unsafe, insanitary and substandard structures in said area, clear said area

and make or cause to be made all necessary site improvements.

"C. Dispose of the land comprising said northwest area either by sale or lease to private and public purchasers for industrial and commercial uses, at the fair re-use value of said property, which represents the value at which defendant Housing Authority determines such land should be made available in order that it will be developed or redeveloped for the purposes specified, which fair re-use value may be less than the cost of acquisition, demolition and clearance and site improvements.

"D. After clearance, and at the time of disposition, of land in said northwest area for private and public uses, cause to be placed upon such lands certain use restrictions, including restrictions and covenants that the purchasers and lessees will (a) use the land for the purposes designated by the housing authority, and (b) begin the building of their improvements within a time which the authority fixes as reasonable.

"That in order to assist and cooperate in the carrying out of the redevelopment of said northwest area, the defendant City will provide the local grants-in-aid necessary to obtain the Federal financial assistance under Title I, and such grants-in-aid will include demolition or removal work, site improvements in the project area and the provision of certain public facilities which are primarily of direct benefit to the project, * * *."

The complaint further states that (1) since the plaintiff's property is within the Vaughn Street Area, the defendants have threatened that "unless it can be acquired by purchase it will be taken by eminent domain proceedings"; and (2)

"all other owners of property located in the designated Northwest Area, are immediately confronted with the danger of having their property taken from them without their consent; and the plaintiffs

and all other taxpayers of the City of Portland are confronted with the further danger of being required to contribute to the cost of acquiring and redeveloping said project.''

According to the Housing Authority's answer, that agency is

"preparing a plan for the acquisition and redevelopment of the Vaughn Street Redevelopment Project Area. Such redevelopment plan will be made in compliance with the Oregon Redevelopment Law and the Federal Redevelopment Act (42 USC, Secs. 1441-1460) and will become effective and be carried into execution only after it has been approved by the Council of the City of Portland and by the Administrator of the Housing and Home Finance Agency of the Federal Government. The plan will provide, among other things, a feasible method for the temporary relocation of families displaced from the Project Area, and also a method of providing * * * decent, safe and sanitary dwellings substantially equal in number to the substandard dwellings to be cleared from the area, * * *.''

That answer says further:

"* * * any properties which will be acquired in said area and which are not in themselves deteriorated, dilapidated, substandard, or otherwise unsafe or unsanitary, are limited in number and extent and will be acquired only because such acquisition and the removal of the structures thereon is essential to the orderly, economic and effective redevelopment of the area as a whole so as to remove, prevent or reduce blight, blighting factors or the causes of blight.''

We now turn to the three enactments by our legislature which the complaint mentions and which we cited in a previous paragraph.

The Housing Authorities Law has as its principal purposes slum clearance and the creation of dwelling

accommodations for persons of low income. The Housing Cooperation Law authorizes municipalities to aid housing authorities in the acquistion of facilities such as parks, playgrounds and streets. Since those two statutes are of subordinate interest in this proceeding, the foregoing will suffice as a summary of them. We now turn to the Urban Redevelopment Law.

Section 1 of the Urban Redevelopment Law announces:

"It hereby is found and declared (a) that there exists within the state blighted areas (as defined herein) or areas in the process of becoming blighted; (b) that such areas cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state, that these conditions necessitate excessive and disportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (c) that the clearance, replanning and preparation for rebuilding of these areas, and the prevention or reduction of blight and its causes, are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern; (d) that there are also certain areas where the condition of the title, the diverse ownership of the land to be assembled, the street or lot layouts, or other conditions prevent a proper development of the land, and that it is in the public interest that such areas, as well as blighted areas, be acquired by eminent domain and made available for sound and wholesome development in accordance with a redevelopment plan, and that the exercise of the power of eminent domain and the financing of the acquisition and preparation of land by a public agency for such redevelopment is likewise a public use and purpose; (e) that redevelopment activities will stimulate residential

construction which is closely correlated with general economic activity; that all such undertakings authorized by this Act will aid the production of better housing and more desirable neighborhood and community development at lower costs and will make possible a more stable and larger volume of residential construction, which will assist materially in maintaining full employment; and (f) that the necessity in the public interest for the provisions hereinafter enacted hereby is declared as a matter of legislative determination."

Section 2 limits the operation of the act to counties having a population of 70,000 or more. In such counties § 2 enables housing authorities to pursue redevelopment work by the following means:

(1) "acquire blighted areas which hereby are defined as areas (including slum areas) with buildings or improvements which, by reason of dilapidation, overcrowding, lack of ventilation, light and sanitary facilities, deleterious land use, or any combination of these or other factors, are detrimental to the safety, health, morals or welfare of the community;" (2) "acquire other real property for the purpose of removing, preventing or reducing blight, blighting factors or the causes of blight;" (3) "acquire real property where the condition of the title, the diverse ownership of real property to be assembled, the street or lot layouts, or other conditions prevent a proper development of the property and where the acquisition of the area by the authority is necessary to carry out a redevelopment plan;" (4) "clear any areas acquired and install, construct or reconstruct streets, utilities and site improvements essential to the preparation of sites for uses in accordance with the redevelopment plan;" (5) "sell or lease land so acquired for uses in accordance with the redevelopment plan;" (6) "accomplish a combination of the foregoing to carry out a redevelopment plan."

Section 3 declares that in redevelopment work, housing authorities possess the powers conferred upon them by the Housing Authorities Law and by all other statutes "relating to slum clearance and housing projects for persons of low income" including the power to "acquire real property by eminent domain or purchase."

Section 4 denies to housing authorities power to undertake redevelopment work until the governing body of the municipality in which the project is situated has received and approved a plan for the work.

Section 5 authorizes housing authorities to make land in redevelopment projects "available for use by private enterprise or public agencies in accordance with the redevelopment plan." It adds:

"Such land shall be made available at its fair re-use value, which represents the value (whether expressed in terms of rental or capital price) at which the authority determines such land should be made available in order that it may be developed or redeveloped for the purposes specified in such plan."

The section further provides:

"To assure that land acquired in a redevelopment project is used in accordance with the redevelopment plan, an authority, upon the sale or lease of such land, shall obligate purchasers or lessees: (1) To use the land for the purpose designated in the redevelopment plan; (2) * * * Any such obligations by the purchaser shall be covenants and conditions running with the land where the authority so stipulates."

Section 8 provides:

"For the purpose of coordinating its activities and undertakings under this Act with the needs and undertakings of other local organizations and

groups, a housing authority shall establish an advisory board consisting of * * *."

The remaining parts of the act are not sufficiently material to the contentions of the parties to warrant review herein. The foregoing pages disclose the facts, the contentions of the parties and the pertinent provisions of the applicable statutes.

Before proceeding directly to the assignments of error, we shall pause for a moment upon the nature of this suit and the present status of the attacked redevelopment project. It is necessary to know the present condition of the project before we can determine the rights of the parties.

It will be recalled that the plaintiffs contend that the Housing Authority, unless restrained by injunction, will acquire, through purchase if possible but by eminent domain if necessary, virtually all of the property in the Vaughn Street Area and then convey or lease it to private persons. The plaintiffs' main contention is that the defendants' design does not envision that the property will be put to a public use and that therefore the Housing Authority should not be permitted to employ the power of eminent domain for its acquisition.

It is impossible to discern from the records of the public bodies the exact purpose to which the property in the area will be put after it has been acquired by the Housing Authority. In fact, it is by no means certain that the city of Portland will authorize the Housing Authority to acquire any of it. The city has taken no action looking toward approval of any redevelopment plan for the area. The only action which the city has taken was the adoption of the resolution which is summarized in a preceding paragraph of this opinion. It (1) found that it was "necessary

and in the public interest'' that Portland undertake "an effective program of slum clearance and urban redevelopment;'' (2) resolved that it was desirable that preliminary work looking toward eventual urban redevelopment should be initiated; and (3) petitioned the federal agency to reserve capital-grant funds in the amount of $1,412,880 for use in redevelopment work in the event that a program were devised. The resolution had no special reference to the Vaughn Street Area. By returning to § 4 of the Urban Redevelopment Law, it will be seen that it says that housing authorities "shall not initiate any redevelopment project under this Act until the governing body of each city or town * * * in which any of the area to be covered by said project is situated, has approved'' a plan for the work. Thus, before a Housing Authority can undertake work upon a project it must prepare a plan for the latter and gain the city's approval of it. The section specifies the information which a plan must contain before it is submitted to a city council and declares that the plan must be "sufficiently complete (1) to indicate its relationship to definite local objectives as to appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements; (2) indicate proposed land uses and building requirements in the area; and (3) to indicate the method for the temporary relocation of persons living in such area; and also the method for providing (unless already available) decent, safe and sanitary dwellings substantially equal in number to the number of substandard dwellings to be cleared from said area, and rents within the financial reach of the income groups displaced from such substandard dwellings. Such municipalities hereby are authorized to approve re-

development plans through their governing body." Sections 1455 and 1460(b) of the Federal Slum Clearance and Farm Housing Act, 42 USCA, contain corresponding requirements. It is apparent from the section of the federal act which has been codified as § 1455 that the administrator must approve the plan submitted to him before he can grant federal financial aid for its consummation.

The complaint does not aver that the Housing Authority has drafted any plan for the Vaughn Street project, let alone a plan which includes the information demanded by the sections of the Oregon and federal statutes just noted. Since the complaint does not aver that any plan has been drafted, it, of course, does not claim that any has been submitted to the city of Portland or to the federal administrator. The answer of the Housing Authority, as we have seen, states that the agency "is now engaged in preparing a plan for the acquisition and redevelopment of the Vaughn Street Redevelopment Project Area." It adds that "such redevelopment plan will be made in compliance" with the applicable Oregon and federal statutes "and will become effective and be carried into execution only after it has been approved by the Council of the City of Portland and by the Administrator of the Housing and Home Finance Agency of the Federal Government." It is obvious that no plan for the area has been submitted to or received the approval of either the city of Portland or the federal administrator.

Since the foregoing is the present status of the contemplated redevelopment project, we cannot know whether the property in the area, if eventually acquired by the Housing Authority, will be rendered available for use by private enterprise or will be delivered to some public agency; see § 5, Urban Redevelop-

ment Law. Likewise, we cannot know what, if any, "covenants and conditions running with the land", as authorized by § 5 of the Urban Redevelopment Law, may be imposed by the Housing Authority in the event that it acquires the property and later conveys it into private ownership. Again, due to the absence of a plan, we cannot know from the present state of affairs whether or not the Housing Authority, if it acquires ownership, will alter the lot and street arrangements in the area.

Although a plan of the kind required by § 4 of the Urban Redevelopment Law has not been prepared and received the approval of the council of the city of Portland, yet it is apparent that an actual controversy exists between the plaintiffs and the defendants concerning the validity of the Urban Redevelopment Law. The plaintiffs, as owners of well-maintained property within the area, have a protectible interest in the controversy, and urge that the statute out of which the controversy arose is invalid. The defendants maintain the validity of the enactment and both avow a purpose to proceed under it. The Housing Authority, as we have seen, asserts that it is drafting a plan of the kind required by § 4 of the act, and the city's answer "admits and alleges that the adoption of said Resolution * * *, together with said subsequent action by defendant Housing Authority, constitutes an immediate possibility and threat that defendant city, unless restrained, will approve said redevelopment plan now being prepared". In its answer, the city states that it will provide the Housing Authority with money and assist it in other ways with the project. Thus an actual controversy exists between the property owners and the apposite public bodies concerning the validity of the statute which the public bodies seek to put into

operation. The fact that the plan has not reached the blueprint stage has not prevented the controversy from ripening into one which both parties wish the courts to settle.

■■ The purpose of the Uniform Declaratory Act, of which ours is a counterpart, is to afford people who are involved in a justiciable controversy relief from its uncertainty and the misunderstandings which may arise out of it. The plaintiffs, as we have seen, have a protectible interest; that is, they own an item of property which is located in the project area. The controversy centers in the mooted validity of the Urban Redevelopment Law, and in that controversy the public, obviously, has an interest. The controversy is not academic, but is vital to the plaintiffs and of general interest to the public, for the challenged act was enacted to promote the public health, safety, welfare and economy. A settlement of the controversy will prevent further invasion of the plaintiffs' private rights and may curtail expenditure of public funds. It is reasonable to believe that the entry of a declaratory judgment in this suit will terminate the controversy and serve a good purpose: *Demers v. Peterson*, 197 Or 466, 254 P2d 213. We think that the pleadings state a justiciable controversy within the purview of the Declaratory Judgments Act, §§ 6-601 to and including 6-616, OCLA; see *Anderson, Declaratory Judgments*, 2d ed, § 17.

Since no plan has been prepared for the disposition of the properties in the Vaughn Street Area, in the event the Housing Authority acquires them, we cannot know, as we consider the assignments of error, the exact purposes to which the area will be put. Accordingly, in our consideration of the assignments of error,

we cannot go further than to assume that the properties will be employed for one of the purposes authorized by the Urban Redevelopment Law.

We shall now consider the third assignment of error. We take it out of its natural order because the plaintiffs (appellants) describe it as their most important assignment of error. It reads as follows:

"The Court erred in refusing to hold said act unconstitutional as being in violation of Article I, Section 18 of the Oregon Constitution and the 14th Amendment to the Constitution of the United States by taking appellants' property for a use which is not a public use and without due process of law."

Article I, Section 18, Oregon Constitution, provides:

"Private property shall not be taken for public use * * * without just compensation."

In arguing in behalf of this assignment of error, the plaintiffs say:

The effect of the questioned act is to permit respondents to condemn appellants' land as being in a so-called 'blighted area' and turn the same over to new private owners to use for business or industrial purposes. While the law does serve a public purpose in a broad sense by clearing the area, the condemned land is put to a private rather than public employment. We contend that the act takes the property of appellants by the fiat of eminent domain for a private purpose within the meaning of the Oregon decisions on this provision."

*Smith v. Cameron,* 106 Or 1, 210 P 176, 27 ALR 510, after taking note of the rule employed in some jurisdictions which deems that "public benefit" is the equivalent of "public use", and thereby permits private property to be taken by a private industry, provided the latter through the development of an im-

portant local natural resource contributes to the general welfare, says:

> "The courts, including this court, which take the opposing view assert that there is a distinction between a public use and a benefit to the public, and that private enterprises that give employment to many people and produce large quantities of commodities of various kinds are not necessarily public uses; and that the term 'public use' as used in Constitutions is not synonymous with the term 'public benefit'; * * *. The idea emphasized by this main line of decisions is expressed by Judge Cooley thus:
>
> " ' "The public use implies a possession, occupation and enjoyment of the land" by the public or public agencies, and it is not enough "that the public would receive incidental benefits, such as usually spring from the improvements of lands or the establishment of prosperous private enterprises." ' Cooley's Constitutional Limitations (7 ed.), 766."

Presently the decision quoted with approval the following from Lewis on Eminent Domain, 2d ed, § 165:

> "The use of a thing is strictly and properly the employment or application of the thing in some manner. The public use of anything is the employment or application of the thing by the public. Public use means the same as use by the public, and this it seems to us is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are: First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words any force as a limitation or renders them capable of any definite and practical application.

"If the Constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use and the act of appropriation is void. This interpretation will cover every case of appropriation that has been deemed lawful by any court, except a few in relation to mills, mines and drainage. If exceptional circumstances require exceptional legislation in those respects in any state, it is very easy to provide for it specially in the Constitution, as has been done in several states."

*Smith v. Cameron,* supra, embraced the interpretation of "public use" given in those two authorities. The interpretation thus announced has never been questioned in this state.

█ The Smith decision renders it clear that the term "public use", in our Constitution, means a more intimate relationship between the public and an item of property which has been acquired under the power of eminent domain than is denoted by terms such as "public benefit" and "public utility". "Public use" demands that the public's use and occupation of the property must be direct. If someone other than the public uses the property, the fact that the public will share in the benefits does not suffice. It must be the public which will use and occupy the property upon its acquisition. In the present instance, it is clear that if the attacked statute is sustained as valid it will be a public body, the Housing Authority, and not a private person, which will be authorized to acquire the prop-

erty in the Vaughn Street Area. Likewise, upon its acquisition and before its resale or lease, if either ever occurs, it will be a public body, the Housing Authority, which will use, possess and occupy the property. No private person will use, possess, have an interest in, or make a profit out of it.

We now return to the facts shown by the record because they indicate whether or not the public will use the property if the Housing Authority is permitted to acquire it.

■ As we have seen, the studies and surveys conducted under the auspices of the Housing Authority show that housing in the Vaughn Street Area is substandard. Its residential and factory structures rub elbows with one another to the disadvantage of those who live in the area. The latter is bounded on three sides by property which is devoted to factory and industrial purposes. The heavy traffic, both steam and motor, which passes through the area, and which subjects the latter's children on their way to and from school to hazards, indicates that the section is ill suited as a place for residence. Without further review, we express our conclusion that the area's substandard condition and its bad record for crime, fires, juvenile dependency and juvenile delinquency constitute substantial support for the Housing Authority's finding that the area is blighted. It will be recalled that the Urban Redevelopment Law deems an area blighted when by reason of any of the adverse factors mentioned in the act, or through a combination of them, the area has "become detrimental to the safety, health, morals or welfare" of the city. When a section of a city has deteriorated to an extent that it is harmful to morals, health or good deportment, the evil effects which

emanate from it do not confine themselves to the area; they spread into the entire community.

■ Redevelopment work, as authorized by the Urban Redevelopment Law, does not consist alone of the sale of the property which comprises a redevelopment area. If the challenged statute contemplated that the Housing Authority should do no more than acquire, through the power of eminent domain, the property which comprises a project area, and then sell it to private parties who could do with it whatever they chose, the statute, obviously, would be invalid.

It is possible that under the Urban Redevelopment Law and its two companion measures the property in the Vaughn Street Area will not be sold, but will be kept in public ownership for a use unquestionably public, such as conversion into parks, playgrounds, streets or the site of public buildings. A fixed schedule is set forth in our redevelopment law to which housing authorities must conform before resale of the property can be ordered. First, the authority must clear the area of all structures and other works which caused the property to become injurious to the public health, morals, etc. Second, after the area has been cleared of blight, the Housing Authority must adopt measures which will not permit the property to relapse into its previous condition. Among the mediums which it can use for that purpose are contracts, or covenants and conditions inserted in title instruments. Third, the Housing Authority must take whatever additional course is delineated in the plan which it drafted and which the governing body of the municipality approved before the Housing Authority was authorized to acquire any of the property. A plan drafted by a housing authority and approved by a city may make provi-

sion, as we have shown, for any one of several kinds of uses for the property which constitutes the redevelopment area. For example, the property may be re-platted and the lot and street areas altered; or the property may be sold to those who will construct upon it low rental housing.

A resale of property in a redevelopment area may lawfully occur only after the housing authority has no more need for the property. A sale at that time is proper, for normally property should not be kept in public ownership but should be restored to the tax rolls when the public has no further need for it. A sale of the property is the final act that takes place concerning the project, if the plan actually calls for a sale, and is in the nature of a winding up of the project. Its purpose is to enable the public treasury to recoup its money. Resales cannot offer private persons opportunities for enrichment or exploitation, for the act declares that property must be sold "at its fair re-use value" and that "an authority, upon the sale or lease of such land, shall obligate purchasers or lessees: (1) To use the land for the purpose designated in the redevelopment plan; (2) to begin the building of their improvements within a period of time which the authority fixes as reasonable." The sale is not the primary purpose of the project, but is only incidental or ancillary to it.

The ultimate result which the challenged statute seeks to achieve is to eliminate conditions which cause fires and breed vice, poverty or disease and to substitute for them a use of the property which will render impossible future blight. In lieu of waiting until the substandard area has produced offenders and delinquents, and then dealing with them, the challenged act

seeks to eradicate the cause. The challenged act is a preventive measure. *Wells v. Housing Authority of the City of Wilmington*, 213 NC 744, 197 SE 693, voices the same views:

"The State cannot enact laws, and cities and towns cannot pass effective ordinances, forbidding disease, vice, and crime to enter into the slums of overcrowded areas, there defeating every purpose for which civilized government exists, and spreading influences detrimental to law and order; but experience has shown that this result can be more effectively brought about by the removal of physical surroundings conducive to these conditions. This is the objective of the Act, and these are the means by which it is intended to accomplish it."

It may be that the measure is ill advised and may prove eventually to be a disappointment, but the wisdom of enactments is a legislative and not a judicial question. The legislature has the right to experiment with new modes of dealing with old evils.

The purposes which the attacked statute seeks to serve are among the most important of the reasons which cause people to band together in governmental units. Matter of *New York City Housing Authority v. Muller*, 270 NY 333, 1 NE2d 153, 105 ALR 905, in voicing the same idea, said:

"The fundamental purpose of government is to protect the health, safety, and general welfare of the public. All its complicated activities have that simple end in view. Its power plant for the purpose consists of the power of taxation, the police power, and the power of eminent domain. Whenever there arises, in the state, a condition of affairs holding a substantial menace to the public health, safety, or general welfare, it becomes the duty of the government to apply whatever power is necessary and appropriate to check it."

■ The statute stems from the police power of the state. With reference to an analogous problem, this court said:

"* * * Moreover, the use of all property whatever is subject to the general police power of the State, to be exercised either directly or through subordinate agencies of the government to whom the state may intrust the exercise of that prerogative." *Gaston, Town of, v. Thompson*, 89 Or 412, 174 P 717.

The police power, unaided by the power of eminent domain appears to be inadequate to accomplish the result which the legislature has selected as its goal. Its time-tested tools—tenement house laws, zoning measures and building codes—are ineffective to accomplish in the Vaughn Street Area the results which the legislature wishes to achieve. Even if padlocks were put upon this house or that one in the area, such drastic action might prove to be ineffective. As was said in *Matter of New York City Housing Authority v. Muller,* supra, "the evil inheres not so much in this or that individual structure as in the character of a whole neighborhood of dilapidated and unsanitary structures." The legislature, through the enactment of the assailed statute, has indicated that acquisition of blighted areas by the Housing Authority and the destruction of the blighted structures is essential to the return of wholesome conditions in the area. Evidently the legislature does not believe that private enterprise can cope effectively with the problems that blighted areas present, and is satisfied that ownership of such areas by public agencies, such as the Housing Authority, invested with broad powers alone suffices to restore the areas to normality.

Blighted areas present the anomaly of receiving a

disproportionate amount of attention of fire, police and health departments, and yet, because of their low assessed values, of contributing to the public revenues a minor amount of tax money.

The foregoing is our best understanding of the results which the legislature believes the Urban Redevelopment Law will yield.

For the purpose of determining the validity of the statute, especially of its grant to housing authorities of the power of eminent domain, let us assume that after its acquisition by the Housing Authority the Vaughn Street Area will be sold into private ownership and will be used for industrial purposes. Let us, therefore, assume that the redevelopment plan will specify that nothing more will be done with the property than (1) the eradication of its blight; (2) the imposition upon the blight-eradicated property of restrictions which will render it impossible for blight to recur; and (3) sale of the property. Thus the question is whether acquisition of property by a public agency for the purposes of renovating it and of then imposing upon it restrictions which will render impossible a recrudescence of conditions which have propagated disease, vice and poverty is the application of the property to a public use.

The legislative assembly of this state, in enacting the challenged act, gave us its answer to that inquiry. The answer is clearly expressed and is found in § 1 of the act, which says that "the clearance, replanning and preparation for rebuilding of these areas, and the prevention or the reduction of blight and its causes, are public uses and purposes." After the act has made that declaration, it adds, "for which public money may be spent and private property acquired." See, also,

§§ 99-2002 and 99-2025, OCLA. The quoted words were written for a valid legislative purpose; that is, for the purpose of making provision for condemnation of the property. We now quote from Opinion to the Governor, 76 RI 249, 69 A2d 531:

"* * * Furthermore, in the situation now before us we need not concern ourselves with whether a mere advantage, benefit or convenience to the public is a public use, as the legislature's declared purpose is to eradicate sources of disease, juvenile delinquency and crime, which in our opinion, clearly constitute a public use."

Although a legislative finding that a taking which the measure authorizes will be for the public's use is not binding upon the courts, yet the latter, in reaching their conclusion, will accord respect to the views of the legislative branch of the government. As stated in *Smith v. Cameron,* supra, the courts

"will always enter upon an inquiry concerning the validity of a statute authorizing the exercise of the power of eminent domain with the presumption that a use is public if the legislature has declared it to be such: 10 R.C.L. 29. See also State v. Hawk, 105 Or. 319 (208 Pac. 709)."

Thus we start our inquiry as to the nature of the use to which the Housing Authority will put the property with a presumption that the public, and not a private person, will use the property.

The fact that the plan which the Housing Authority may draft, and which the city may approve, will possibly provide that the property should be sold to private persons does not in itself demand a holding that the power of eminent domain may not be employed for the acquisition of the property. In *Churchill v. Grants Pass,* 70 Or 283, 141 P 164, the right to employ the

power of eminent domain was sustained notwithstanding the following circumstances:

> "* * * the proposition is to build and own a road for the benefit of its citizens. That it may when built lease or sell it does not alter the fact that primarily it is a public improvement for a public purpose. The objection is not tenable."

*McMahan v. Olcott*, 65 Or 537, 133 P 836, sustained the exercise of the power of eminent domain even though the parties had stipulated

> "that when so irrigated the land would be sold for not less than $100 per acre; and that only 5,600 acres are patented to the state, of which 4,400 are irrigable, and 2,314.63 acres have been sold to private parties."

In *Chicago Land Clearance Commission v. White*, 411 Ill 310, the court held that the taking under the Illinois Blighted Areas Redevelopment Act was for the public's use, notwithstanding the fact that the public agency had entered into a contract for the sale of a part of the property, from which the structures had been removed, to the New York Life Insurance Company. The court said:

> "* * * This contract was entered into pursuant to the provisions of the statute. The controlling motive, however for the present condemnation is to clear from the area in question the moral and physical blight which slum and congestion has created. The subsequent development of the property by the New York Life Insurance Company does not mean that the taking is for a private purpose."

Accordingly, the fact that the property may not long remain in the ownership of the Housing Authority does not in itself indicate that the use will not be public and that the agency may not be invested with the

power of eminent domain. It is the use to which the agency will put the property rather than the length of time for which its ownership will be continued.

We shall now take notice of the holdings by other courts as to the nature of the use to which legislation of this kind subjects the condemned property.

In Opinion To The Governor, 76 RI 249, 69 A2d 531, the majority say:

"* * * Its primary object is to assemble property, whether developed or undeveloped, in a blighted area and to remove therefrom all buildings, structures and other conditions that constitute a menace to the public health and safety. Upon the elimination of a blighted area, thus enhancing the public good, the primary purpose of the act has been accomplished. With the attainment of these fundamentally public purposes the property acquired and held by an agency has been thus clearly devoted to a public use. We see no valid objection to the constitutionality of the act on the ground that the agency may thereafter convey to private interests the property so reclaimed with conditions and restrictions intended to protect the public health and safety from the recurrence of blight in the future. In other words, it is of no consequence if in redeveloping the area private interests may derive some benefit as an incident to the accomplished public purpose."

*Zurn v. City of Chicago*, 389 Ill 114, 59 NE2d 18, says:

"The fact that the continued use of the property for public purposes, after the elimination of slum and blight areas and the redevelopment of such areas has been achieved, is only partially assured and safeguarded by the act, is wholly immaterial. When such areas have been reclaimed and the redevelopment achieved, the public purpose has been

fully accomplished. The fact that the act does not thereafter vouchsafe the continued use of the property acquired for public purposes, does not in any way affect the purposes of the act or render the taking of the property a taking for a use or purpose which is not public. The achievement of the redevelopment of slum and blight areas, as defined in the act, in our opinion, constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved.''

In *Belovsky v. Redevelopment Authority*, 357 Pa 329, 54 A2d 277, the majority opinion declares:

''The present attack upon the constitutionality of the Urban Redevelopment Law centers largely upon the grant therein made to the Redevelopment Authorities of the power to exercise the right of eminent domain. It is contended that the taking of property under the act is not for a public purpose and therefore cannot constitutionally be effected by resort to the power of eminent domain.

''Doran v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834, may be regarded as the prototype of the present case since all the arguments now presented on this subject were there fully considered. The Urban Redevelopment Law closely parallels the provisions of the 'Housing Authorities Law' of May 28, 1937, P.L. 955, 35 P.S. § 1541 et seq., with which the Doran case was concerned. The fundamental purpose of both these acts was the same, namely, the clearance of slum areas, * * *. In the case of the Urban Redevelopment Law the operation of clearing and rehabilitating the 'slums', now called 'blighted areas', is not to be followed by a continuing ownership of properties by the Redevelopment Authorities for any such further and ulterior social-welfare purpose as that of providing low rental homes for persons in moderate circumstances. * * * In the case of the Urban Redevelopment Law, therefore, the justification of the grant

of the power of eminent domain is even clearer than in the case of the Housing Authorities Law, there being in the present act only the one major purpose of the elimination and rehabilitation of the blighted sections of our municipalities, and that purpose certainly falls within *any* conception of 'public use' for nothing can be more beneficial to the community as a whole than the clearance and reconstruction of those sub-standard areas which are characterized by the evils described in the Urban Redevelopment Law.''

Article I, Section 23, Constitution of Alabama, declares:

"* * * private property shall not be taken for, or applied to public use, unless just compensation be first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner; * * *.''

In Opinion of the Justices, 254 Ala 343, 48 So2d 757, the court, in referring to that provision and in deeming valid a measure similar to the one before us, expressed itself thus:

"The theory that Act No. 491 does not violate constitutional restrictions such as section 23, supra, has been approved by decisions of many courts construing such an act as this, holding that the exercise of the police power in clearing a blighted area, such as is described in the Alabama law, supra, is a public use of that area. Belovsky v. Redevelopment Authority et al., 357 Pa. 329, 54 A.2d 277, 172 A.L.R. 953; Schenck v. City of Pittsburgh et al., 364 Pa. 31, 70 A.2d 612; Zurn v. City of Chicago et al., 389 Ill. 114, 59 N.E.2d 18; People, ex rel. Tuohy v. City of Chicago et al., 399 Ill. 551, 78 N.E.2d 285; Redfern v. Board of Commissioners of Jersey City et al., 137 N.J.L. 356, 59 A2d 641; In re Opinion to the Governor, R.I., 69 A.2d 531; General Development Corp. v. City of Detroit, 322 Mich. 495, 33

N.W.2d 919; Bader Realty Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W.2d 489; Amalgamated Housing Corp. v. Kelly, 193 Misc. 961, 82 N.Y.S. 2d 577. See, also, 172 A.L.R. notes 967, 970 et seq." ·

In *State ex rel. Bruestle, City Solicitor, v. Rich, Mayor,* 159 Ohio St. 13, 110 N.E. 2nd 778, the court, in sustaining as valid a statute substantially similar to ours, said:

"The validity of urban redevelopment projects similar to the project involved in the instant case has been uniformly sustained by the courts of last resort in other states. Opinion of the Justices (1950, 254 Ala., 343, 48 So.2d, 757; Rowe v. Housing Authority (Ark. 1952), 249 S.W.(2d), 551; Zurn v. City of Chicago (1945), 389 Ill., 114, 59 N.E.(2d), 18; Chicago Land Clearance Comm. v. White (1952), 411 Ill., 310, 104 N.E. (2d), 236; In re Slum Clearance (1951), 331 Mich., 714, 50 N.W. (2d), 340; Murray v. La Guardia, Mayor (1943), 291 N.Y., 320, 52 N.E. (2d), 884, certiorari denied, 321 U.S., 771; Belovsky v. Redevelopment Authority (1947), 357 Pa., 329, 54 A.(2d) 277, 172 A.L.R., 953; Schenck v. Pittsburgh (1950), 364 Pa., 31, 70 A.(2d), 612; Opinion to the Governor (1949), 76 R.I., 249, 69 A.(2d) 531; Ajootian v. Providence Redevelopment Agency (R.I. 1953), 91 A.(2d), 21; Nashville Housing Authority v. City of Nashville (1951), 192 Tenn., 103, 237 S.W.(2d), 946. See also, annotations, 130 A.L.R. 1069, and 172 A.L.R., 966.

"Only one court of last resort has held to the contrary. Adams v. Housing Authority of City of Daytona Beach (Fla.), 60 So.(2d), 663.

"The exercise of the right of eminent domain under such a project, carried out pursuant to state law, has likewise been held by the Supreme Court of the United States as not contrary to the Fourteenth Amendment to the federal Constitution. Burt v. City of Pittsburgh, 340 U.S., 802, 95 L.Ed., 589, 19 U.S. Law Week, 3057."

· The pertinent provision of the Ohio Constitution reads as follows:

"Private property shall ever be held inviolate but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money; and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."

*The People ex rel. John Gutknecht, State's Attorney, Appellant, v. The City of Chicago et al., Appellees,* 111 NE2d 626, sustained the validity of a statute which authorized the Illinois Land Clearance Commission to acquire, through the power of eminent domain, areas of predominantly open land which were unmarketable because of "obsolete platting, diversity of ownership, deterioration of structures or site improvements, or taxes and special assessment delinquencies * * *." The court observed: "So far as we are aware, this is the first case in which governmental efforts to deal with unmarketable areas of vacant land have received judicial consideration." Referring to *Zurn v. City of Chicago,* supra, *Chicago Land Clearance Comm. v. White,* supra, and a similar case, the decision said:

"The method employed by the present statute, acquisition of the land by a governmental agency and its subsequent sale or lease to private interests, cannot be distinguished from the method which those decisions have sustained.

\* \* \* \* \*

"Upon the authority of the Cremer, Zurn, and White cases, we hold that the Amendatory Act does not violate section 13 of article II of the constitution. The purpose and use to which the vacant blighted property is to be taken is both a public purpose and a public use, since the taking tends to alleviate a housing shortage, is an essential aid and adjunct to slum clearance, removes hazards to health, safety, welfare and morals of the community by developing the area, and eliminates factors impairing and arresting sound community growth."

*Adams v. Housing Authority of City of Daytona Beach*, 60 So2d 663, mentioned in *State ex rel. Bruestle v. Rich*, supra, and *Housing Authority of the City of Atlanta et al. v. Johnson et al.*, 209 Ga 560, 74 SE2d 891, held the Florida and Georgia redevelopment statutes invalid.

The majority opinion in the Florida case acknowledged that three earlier decisions by the court sustained as valid the Florida Housing Authority Act which authorized slum clearance followed by the construction of housing for people of small income. The majority opinion stated that the purpose of the redevelopment statute was not to provide housing, but to authorize the acquisition of property in blighted areas so that it could be sold to private investors for industrial uses. Without citing any of the decisions, the prevailing decision acknowledged that redevelopment acts "have been upheld by some of the courts of last resort of other states," but bestowed no attention upon any of the cases. It declared: "We have our own Constitution and adjudicated cases by this court which are controlling." In the instance before the court, the Housing Authority wished to acquire six and one-half acres of land occupied by dilapidated structures in which 60 Negro families lived. The deci-

sion did not question the Housing Authority's finding that the habitations were unfit and unsanitary and that the area was blighted. The redevelopment plan called for the destruction of the structures and the construction of sewers, sidewalks and streets. It contemplated that after the redevelopment work had been completed the property would be sold for commercial purposes at its fair re-use value. The court termed the project "a real estate promotion, * * * a gigantic real estate promotion scheme." In holding the act invalid, the majority opinion stated inferentially that the city had "the power to order the discontinuance of the occupation of houses which are unsafe, unsanitary or breeding grounds for disease, or if it desired, it could condemn the houses by the process of eminent domain and leave the real estate for the owners to redevelop or use within the limits of a zoning ordinance." Justice Terrell, in a dissenting opinion, declared:

"I think a look at the photographs filed in evidence is a complete answer to every objection advanced in the majority opinion.

"I yield to no one in my devotion to private enterprise and the sanctity of property rights, as protected by the constitution, but I cannot look at the photographs and record in this case and point out where the sanctity of property rights is being violated by the act or the plan of development. Neither do I think the constitution was intended to be construed so as to condemn a community to live in eyeshot of a social blight like that revealed by the record, particularly when the legislature has provided a reasonable and approved means to remove it. * * * To contend that the same relief could be secured by invoking the police power instead of the power of eminent domain, is begging the question. The legislature provided a way that

is reasonable. And I do not think the makers of the constitution ever intended that instrument to be construed so as to make it a barrier to any community in removing filth, unsanitary places or other conditions which contribute to crime, deteriorate public morals or which cause an inordinate drain on the tax revenues for police protection to counteract these and kindred influences."

Apart from the decision just reviewed, *Housing Authority of the City of Atlanta, Georgia, v. Johnson, et al.,* 209 Ga. 560, 74 SE2d 891, is the only other one which has come to our attention which held a redevelopment statute unconstitutional. In that case, the authority proposed (1) to acquire a tract of 139 acres containing 818 structures in which 5056 people lived; (2) remove the buildings; and (3) to sell the property to industrial enterprises. Although the decision did not describe the condition of the dwelling houses, yet since it spoke of a purpose "to clear away slum or blighted areas", it possibly indicated that the houses were substandard. According to the decision, "the main contention" before the court was that the act "provides for an unlawful and illegal use of the power of eminent domain." The court acknowledged that it had sustained as valid the Georgia Housing Authorities Law and that its decision to that effect "has since been followed by several decisions of this court", but added, "not without some misgivings on the part of some members of the court as now constituted." The court felt that it was required to assume that there existed no shortage of housing, and that the Housing Authority proposed to construct no dwelling units. It declared:

"The object is to clear away slum or blighted areas and then to have the property redeveloped by private individuals for private purposes."

Going on, the court said:

> "We know that some courts of other jurisdictions have held that this can be done, and others have held it cannot be done. What constitutes a 'public use' under the constitution and laws of Georgia is a question that must be decided by the courts of this state and what some other jurisdictions may have decided is in no way binding."

The decision neither cited nor analyzed the decisions which it mentioned in the above transient manner. The Georgia constitution provides:

> "The exercise of the right of eminent domain shall never be abridged, nor so construed as to prevent the General Assembly from taking property and franchises, and subjecting them to public use."

Evidently, because the act did not require new housing to be erected upon the blighted area after the removal of the blight, the court inferred that the act's sole purpose was to take the property of one person so that another could acquire it. It rejected an argument that removal of blight might decrease juvenile delinquency by saying, "We think juvenile delinquency exists on both sides of the railroad tracks." It concluded that the redevelopment statute "provides for an unauthorized use of the power of eminent domain."

*Nashville Housing Authority v. City of Nashville,* 192 Tenn 103, 237 SW2d 946, in a carefully written opinion, sustained the validity of a Tennessee statute entitled the Slum Clearance Law which was substantially the same as our Urban Redevelopment Law. In so doing, the court said:

> "The Slum Clearance Law differs not at all in principle from the Housing Authorities Law, and is merely an extension of that legislation for the purpose as stated in the Act, of clearing 'slums'

and 'blighted areas' in cities, and destroying not only old and dilapidated dwellings, but also old and dilapidated industrial and commercial buildings for the purpose of redevelopment * * *.''

It quoted from one of its earlier decisions the following:

" 'The courts reason that the primary object of all government is to foster the health, morals and safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime. The character of the houses in such districts make of them a fire hazard. The existence of such districts depresses the taxable value of neighboring property and deprives the State of revenue. The State is also put to great expense in combating disease, crime and conflagration originating in such localities. * * *

" 'Without dissent, therefore, the courts have reached the conclusion that slum clearance was a public purpose and that Housing Authorities serve a public use. Upholding statute similar to the Acts before us granting the power of eminent domain to organizations like complainant herein, we refer to * * *.' ''

It expressed its conclusion as follows:

"Since we find that the public purpose defined in the Act of 1945, which justified the grant and exercise of the sovereign right of eminent domain was 'slum clearance' by the acquisition of 'blighted areas', defined in Code sec. 3647.53, and since we further find that the disposition of the property after its acquisition and slum clearance, is incidental to that primary public purpose, we hold that the Act is not objectionable under sections * * *.''

We shall review the precedents no further. It is evident that all of them deem that the purposes of redevelopment laws are (1) to rid areas of conditions

which propagate such evils as vice and disease, and (2) to render impossible a return of the unwholesome conditions. None of them questions the competency of redevelopment laws to accomplish effectively those results. The decisions which analyzed redevelopment acts and bestowed attention upon the authorities found that the measures which housing authorities can take to rid areas of blight and repel its recurrence, subject the property in the area to public use within the purview of constitutional provisions which govern the power of eminent domain. The Georgia and Florida decisions, without doubting that the purposes of redevelopment statutes are to eliminate blight and thwart its recurrence, gave scant attention to the decisions of courts which command the respect of the profession and of the public. They felt that since redevelopment acts do not require the construction of new housing, they were forced to hold, under their local constitutions and statutes, that the employment of the property for the elimination of blight and its permanent banishment could not be deemed public uses. It will be recalled that *Belovsky v. Redevelopment Authority,* supra, found "even clearer" justification for the grant of the power of eminent domain for the acquirement of property for redevelopment purposes than for public housing. That decision, which was by the Pennsylvania court, supported its statement with persuasive reasons. It added, "Nothing can be more beneficial to the community as a whole than the clearance and reconstruction of these areas." All of the courts, with the exception of Georgia and Florida, hold that when property is taken for the purpose of ridding it of blight and of rendering impossible its return, the operations just mentioned subject the property to public use. Its subsequent resale, so those courts hold,

does not negate the public use which was made of the property during the elimination of the blight and the imposition of barriers against its return. The implication of the Georgia and Florida decisions that the sale of the property, after the public has completed its use of it, obliterates the public character of the use runs counter to the views expressed by this court in *McMahan v. Olcott,* supra, and *Churchill v. Grants Pass,* supra.

 It appears to us that when a section of a city, like the Vaughn Street Area, in losing its old character as residential property and in struggling against obsolete planning to adapt itself to industrial purposes, sinks into a substandard condition which subjects the city's health, morals and safety to uncommon hazards, the acquisition of the area by the public for the purpose of eradicating its evils and thwarting recrudescence summons the property to public use. Clearly, the public will have the use of the property while the old structures are being wrecked and while the "site improvements", of which the complaint speaks, are being made. During that period the property will be devoted to the public's occupancy and use. Tearing down the old structures and making the site improvements are not, however, the most important of the operations that will take place in the transition of the property's use. The matter of greatest consequence will be the transformation to which the entire tract will be put, and the disappearance from the area of conditions which breed vice, disease, delinquency and an undue number of fire calls. It may be that the public's ownership of the property will not be for a long period, but the length of the period is unimportant unless it in itself indicates that acquirement of the fee is unnecessary and that some other estate in the property

would serve equally well. The plaintiffs do not contend that a lesser interest in the property would suffice for the purposes of the act. It will be recalled that placing in the deeds of reconveyance conditions and covenants to prevent the recurrence of blight is one of the principal means by which the act seeks to achieve its purposes. Therefore, the acquisition of the fee appears to be essential. We adopt the following observation, which was made in *State ex rel. Bruestle v. Rich,* supra:

> "* * * Also, restrictions on the use of the property, for the public purpose of preventing recurrence of slum conditions, may reasonably appear to offer a surer method of preventing such recurrence than any other method such as zoning. Under such circumstances, it is neither arbitrary nor unreasonable (see State, ex rel, Gordon, City Att., v. Rhodes, Mayor (156 Ohio St.), supra) to say that the fee in the real estate in the area must be acquired as 'reasonably needed' for (see City of East Cleveland v. Nau, supra) the primary purposes of slum clearance and the prevention of the recurrence of slums. Dingley v. City of Boston (1868), 100 Mass., 544."

The legislature evidently found that complete dominion over the property and acquisition of nothing less than the fee would suffice. As we just indicated by the language which we quoted, the legislature had good reason for believing that only through public ownership, rehabilitation and subsequent conditional conveyance could the legislative purposes be accomplished. We, therefore, must believe that complete dominion and acquisition of the fee are essential to the act's purposes. Subsequent sale, as we have said, apart from the restrictions which are inserted in the title instruments, is an incidental and minor detail of the

operation of the act. No court can say that the subsequent sale is the main purpose of the legislation unless it stands prepared to accuse the legislature of enacting the statute for deceptive purposes. The legislature plainly found that the use of the power of eminent domain, operating hand in hand with the state's police power, is essential to rid substandard areas of their blight. *Nashville Housing Authority v. City of Nashville,* supra, in speaking of slum clearance, declared: "We find no constitutional objection to the exercise by the sovereign of the police power and the power of eminent domain in combination." The foregoing analysis indicates that the questioned statute is a reasonable means for dealing with the conditions which the legislature sought to eradicate. We cannot say that the use which this statute proposes to make of the property will not be the public's; to the contrary, the facts clearly show that the use will be by the public. We hold the third assignment of error as lacking in merit.

We now turn to the first assignment of error, which follows:

"The Court erred in refusing to hold said act unconstitutional as being in violation of Article IV, Section 20 of the Constitution of Oregon in that the act contained more than one subject; and further, in that the title does not fully indicate the scope of the act."

Article IV, § 20, Constitution of Oregon, reads as follows:

"Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only

as to so much thereof as shall not be expressed in the title."

The title of the Urban Redevelopment Law reads:

"To authorize housing authorities in any county which has a population of 70,000 or more to clear blighted areas and prevent blight; to acquire real property and make it available for redevelopment by private enterprise or by public agencies in accordance with approved redevelopment plans; and to confer necessary powers on housing authorities, cities and other public bodies, and to make obligations issued by housing authorities in connection with redevelopment projects legal investments and security for deposits; and to authorize the creation of an advisory board to housing authorities composed of representatives of business, real estate, home financing and other interests; providing a saving clause; repealing chapter 562, Oregon Laws 1949; and declaring an emergency."

The plaintiffs claim that the title fails to mention the powers for financing redevelopment work which § 7 of the act confers upon the Housing Authority and the act's "dependence" upon the Housing Authorities Law: §§ 99-2001 to and including 99-2023, OCLA. Further, they argue that the challenged act embraces three subjects which they list as follows: (1) "acquisition of the real property in the blighted areas"; (2) "clearing of such areas, demolition of buildings and setting out of streets and planning the new area and the new uses"; and (3) "machinery for the sale or lease of the property in the area".

■ In *State v. Laundy*, 103 Or 443, 204 P 958, 206 P 290, this court said:

"The office of the title is to advise the members of the legislature of the subject of the proposed legislation, but the details must be found in the

body of the measure. If the subject of the enactment is so expressed in the title as to give reasonable notice of the contents of the law, it is sufficient: * * * ''

■■■ In *State v. Shaw*, 22 Or 287, 29 P 1028, we find:

"'* * * A reasonable construction permits the single subject to be comprehensive enough for practical purposes, and great latitude is allowed the legislature in stating the subject in the title. * * * It is not directed against the generality or comprehensiveness of the title to legislative enactments, nor does it require that the title shall index the details of the act. If the title cover the object of the act, the degree of particularity with which it shall be expressed or set out is for the legislature to determine. A disregard of this constitutional provision will be fatal, but the departure must be plain and manifest, and all doubts will be resolved in favor of the law. * * * The question is, whether, taking from the title the subject, we can find anything in the bill which cannot be referred to that subject.''

■ *Eastman v. Jennings-McRae Logging Co.*, 69 Or 1, quoted with approval the following from *Johnson v. Harrison*, 47 Minn 576, 50 NW 924, 28 Am St Rep 382:

"'* * * The term "subject", as used in the Constitution, is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. * * * All that is necessary is that the act should embrace some one general subject; and by this is meant merely that all matters treated should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.' ''

■ The interpretation of the act and its purposes, which is set forth in the preceding pages of this opinion, renders inevitable a conclusion by us that the act contains only one subject; that is, the revitalization of blighted areas. All else in the act is "properly connected therewith." That subject, we are convinced, is adequately expressed in the title. See, to like effect, *The People ex rel. John Gutknecht v. City of Chicago et al.,* supra; *Spahn v. Stewart,* 268 Ky 97, 103 SW2d 651; *Lennox v. Housing Authority of Omaha,* 137 Neb 582, 290 NW2d 451; *Thomas v. Housing and Redevelopment Authority of Duluth,* 234 Minn 221, 48 NW2d 175; and *Belovsky v. Redevelopment Authority,* supra. The first assignment of error is without merit.

The following is the second assignment of error:

"The Court erred in refusing to hold said act unconstitutional as being in violation of Article I, Section 20 of the Constitution of Oregon in that it constitutes class legislation as prohibited therein by limiting the application of said act to counties having more than 70,000 population, said figure being arbitrary and having no relation to the purposes of said act."

Article I, Section 20, Constitution of Oregon, provides:

"No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

■ Classification is virtually essential in the drafting of laws. Generally, it is unjust to deal with all mankind alike and impractical to deal with all cities in a jurisdiction in the self-same way. The lawmaker, in most cases, is required to detect the differences which exist among the persons, places, objects or industries

to which the act which he is writing will become applicable, and to make provision for differences in treatment which the difference in nature demands. Classification is rendered invalid by Article I, Section 20, Constitution of Oregon, only if it is arbitrary, unreasonable and not based upon differences in distinctive characteristics: *Ladd v. Holmes,* 40 Or 167, 66 P 714.

Since blight is an urban disease, the author of the act now before us, in penning it, confined its operation to municipalities. The squalor which people call slums does not consist of an isolated structure, but of a street or section of a city. Accordingly, the draftsman of the Urban Redevelopment Law rendered it applicable only to "blighted areas", and since blighted areas generally occur only in larger centers, he limited the act's operation to municipalities which are found in counties that have a population of 70,000 or more.

Difference in the size of cities may call for difference in legislative treatment. Classification of cities upon the basis of their population is not improper if their difference in size has a reasonable bearing upon their needs and the conditions to which a legislator should give heed: *State v. Kincaid,* 133 Or 95, 285 P 1105, 288 P 1015; *Seaside v. Oregon Surety and Casualty Co.,* 87 Or 624, 171 P 396; *Ladd v. Holmes,* 40 Or 167, 66 P 714.

We shall now take notice of several decisions which were concerned with issues analogous to those before us.

From *Williamson v. Housing Authority, etc., of Augusta,* 186 Ga 673, 199 SE 43, we quote:

"* * * The size of the population of a com-

munity or city furnishes a legitimate ground of differentiation. It is a well-known fact that slum conditions and congestion in housing are more acute in the larger cities."

We take the following from *State ex rel. Porterie, Attorney General, v. Housing Authority of New Orleans,* 190 La 710, 182 So 725:

"* * * The Legislature found—and it is common knowledge—that so-called slum districts are more prevalent in cities with a population exceeding 20,000 than in smaller ones. Therefore, there is more need for the operation of this law in the cities designated than in smaller ones and in towns."

*Lennox v. Housing Authority of City of Omaha,* 137 Neb 582, 290 NW 451, in sustaining the validity of the Nebraska Housing Authority Law, said:

"Plaintiffs insist that the legislation is special rather than general and therefore inhibited by section 18, art. III of the state Constitution. We do not deem it necessary to cite authority for the statement that the legislation has general application to all cities of the metropolitan class and that it has none of the aspects of special legislation."

From *Krause v. Peoria Housing Authority,* 370 Ill 356, 19 NE2d 193, the following is taken:

"Appellants contend that the limitation of power to create a housing authority to cities having a population of over 25,000, and counties, constitutes an arbitrary classification. Classifications based on population have been upheld whenever there is a reasonable relation between the population and the objects and purposes of the act. Mathews v. City of Chicago, 342 Ill. 120, 174 N.E. 35. Admittedly the housing problem is more acute in large communities than in small ones. The provision with reference to counties shows that the legislature considered the slum-clearance problem one that is

State-wide. By this provision the need for slum clearance in smaller cities is met. The classification of cities by population has a reasonable relation to the objects sought to be obtained. Neither it, nor the provision as to counties, is arbitrary."

We do not believe that the classification made in the act, concerning which the plaintiffs complain, is arbitrary and unsupported by reason. In our opinion, the challenged classification does not violate our above-quoted constitutional provision. The assignment of error is without merit.

Since the sixth assignment of error is based upon the same constitutional provision (Article I, § 20, Constitution of Oregon) as the one upon which we just ruled, we shall now consider it. It reads:

"The Court erred in refusing to hold said act unconstitutional on the ground the same violates Article I, Section 20, of the Oregon Constitution, in that it constitutes class legislation in that it favors one group or class of persons over others and takes appellants' property for the benefit of the favored class."

The plaintiffs argue:

"We contend here that the effect and purpose of this act is to take the property of plaintiffs and those similarly situated and sell the same to others. There is no provision herein to permit the present owners, if their use of the property is now unoffensive, to remain in their property. Rather, they are required to sell; and then, perhaps with no change to their property, another comes in and gets the benefit and use that the former owners had. The law is such that it is class legislation of the worst sort. It does not limit its scope to particular bad pieces of property, but takes all."

It will be recalled that in recent years the conversion of the Vaughn Street Area into industrial occupancy has progressed at an accelerated pace. Industries, such as foundries, which create grave fire hazards, and factories which produce highly flammable products, of which paint is an example, operate alongside dwellings. Although during the past forty years "the area has been undergoing a change from residential to industrial and commercial uses", the platting of the area "with lots varying in width from 20 feet to 50 feet", obviously, hampers the conversion of the area into the use for which it is best suited. One can readily understand that the problem which the area presents cannot be solved by dealing with this or that specific house. The mischievous results which the area yields come from it as a whole, and particularly from the fact that the useful and the outmoded are thrown together promiscuously.

*State ex rel. Bruestle v. Rich,* supra, considered a contention similar to the plaintiffs'. In rejecting it, the court said:

"The answer of respondents alleges that ten of the 331 buildings within the redevelopment area are not substandard buildings and that 2.7 per cent of the area constitutes vacant land. It does not follow that the area is not a slum area or that the acquisition of the buildings and vacant land referred to is not necessary in order to clear a slum area and prevent recurrence of the slum conditions in that area. See In re Edward J. Jefferies Homes Housing Project (1943), 306 Mich., 638, 11 N.W.(2d), 272; In re Housing Authority of Charlotte (1951), 233 N.C., 649, 65 S.E.(2d), 761; Stockus v. Boston Housing Authority (1939), 304 Mass., 507, 24 N.E. (2d), 333."

We have read the three authorities cited in the language just quoted and found that they fully support the decision's conclusion. For example, the cited North Carolina decision says:

> "* * * And the fact that a few isolated properties in an area may be taken and dismantled which are above the standard of slum properties, or that some few desirable homes will be taken, will not affect the public character of the condemnation proceeding. Blakemore v. Cincinnati Metropolitan Housing Authority, 74 Ohio App. 5, 57 N.E.2d 397; In re Edward J. Jefferies Homes Housing Project of Detroit, 306 Mich. 638, 11 N.W.2d 272."

The Michigan decision (In re Edward J. Jeffries Homes Housing Project of Detroit), which was cited by both the Ohio and the North Carolina courts, says:

> "The fact that some desirable homes will be destroyed by the project does not affect the public character of the proceedings. Since slums can be eradicated only by the replanning of entire neighborhoods, the few exceptions cannot be held to change the general condition."

The fact that a few of the dwelling units in the area are standard does not indicate that the entire section is not a blighted one within the purview of the Urban Redevelopment Law. We dismiss this contention as lacking in merit.

The following is the fourth assignment of error:

> "The Court erred in refusing to hold said act unconstitutional as being in violation of Article III, Section 1, and Article IV, Section 1 of the Oregon Constitution, in that said act authorizes an unconstitutional delegation of the legislative power of the state as protected by said sections."

The provisions of our Constitution cited by the plaintiffs are sufficiently portrayed in the following

paragraph of *Van Winkle v. Fred Meyer, Inc.*, 151 Or 455, 49 P2d 1140:

> "Under our constitution, article IV, section 1, the power to make and declare laws, subject only to the initiative and referendum powers reserved to the people, is vested exclusively in the legislative assembly and, by article III, section 1, the powers of government are divided into three departments, namely: the legislative, the executive, including the administrative, and the judicial, and each of said departments is prohibited from exercising any of the powers conferred upon either of the others. Under these provisions the legislature can not confer upon any person, officer, agency or tribunal the power to determine what the law shall be."

In addition to the constitutional provisions cited by the plaintiffs, Article I, § 21, Constitution of Oregon, provides:

> " * * * nor shall any law be passed, the taking effect of which shall be made to depend upon any authority except as provided in this constitution; * * *"

 Since the law-making power is entrusted by the Constitution (Art IV, § 1) to the legislature, it is clear that when an act leaves the legislative halls it must be complete and not contemplate that some other department of our government or an agency will complete it. In other words, the legislature cannot delegate the power to determine what the law shall be.

 Although the legislature cannot delegate its power to make a law or complete one, it can empower an agency or an official to ascertain the existence of the facts or conditions mentioned in the act upon which the law becomes operative: *Savage v. Martin*, 161 Or 660, 91 P2d 273, and *Livesay v. DeArmond*, 131 Or

563, 284 P 166. In the meantime, the statute remains dormant. The above principle was expressed in *Marr v. Fisher,* 182 Or 383, 187 P2d 966, in the following manner:

"* * * If the Act was complete in the sense that the legislative assembly had exercised its discretion and judgment as to the expediency or inexpediency of the income tax exemption provisions— and we think it did— it had the power to determine the conditions on which such Act should go into operation. Indeed, the Constitution itself (Art. I, § 22) expressly confers upon the legislative assembly the right to suspend the operation of laws. If the rule were otherwise, the legislature would indeed be at a great disadvantage in solving many of the complex and difficult problems with which it is confronted."

■ We take the following from 16 CJS, Constitutional Law, p. 415, § 141:

"The legislature must itself fix the condition or event on which the statute is to operate, but it may confide to some suitable agency the fact-finding function as to whether the condition exists, or the power to determine, or the discretion to create, the stated event. The nature of the condition is, broadly, immaterial. Generally, it may consist of the determination of some fact or state of things on the part of the people or a municipality or other body or officers; * * * except that the execution of a statute may not be conditioned on the unbridled discretion of a single individual or an unduly limited group of individuals. * * *

"In any case, as a general rule, the enactment of the statute itself may not be made contingent on the action of officers or people; the act must be complete in itself, must be made law by the legislature and only its effect and operation may be made dependent on the contingency."

*Van Winkle v. Fred Meyer, Inc.*, supra, and *State v. Hines*, 94 Or 607, 186 P 420, are instances in which statutes were held invalid because their execution was conditioned upon the unbridled discretion of trade groups. Those decisions illustrate the principle that the legislature cannot make the effectiveness of one of its enactments depend upon the impulses of anyone. See, to similar effect, *Demers v. Peterson,* supra.

Both *Savage v. Martin,* supra, and *Van Winkle v. Fred Meyer, Inc.*, supra, quoted the following from Locke's Appeal, 72 Pa 491, 13 Am Rep 716:

> "There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

■ When an agency is authorized to determine the existence of facts upon which a statute is to become effective, the latter must lay down the governing policy and standard. In arguing that the Urban Redevelopment Law does not prescribe the needed policy and standard, the plaintiffs cite *Schechter Poultry Corp. v. United States,* 295 US 495, 79 L Ed 1570, 55 S Ct 837, 97 ALR 947, in which Congress attempted to delegate to the President discretionary power to write whatever rules he deemed best for the vast commercial and industrial activities of the country. The delegation was held invalid, the court declaring:

> "There can be no grant to the executive of any roving commission to inquire into evils and, upon discovering them, to do anything he pleases to correct them."

We have found no decision which held any redevelopment act invalid on the ground that it failed

to establish sufficiently the governing policy and standard. In Opinion to the Governor, supra, the court stated:

"We further believe that the act is not objectionable on the ground of improper delegation of legislative power. What shall constitute a blighted area within the meaning of the act is therein described in unmistakable language. The nature and extent of a blighted area must necessarily vary not only in the different cities and towns but also within the same community. All that the legislature can reasonably do in the circumstances to prescribe a fixed standard and rules of general application adapted to accomplish the purpose of the act, leaving to the respective local authorities the responsibility of ascertaining as a matter of fact whether there exists in the community a blighted area within the meaning of the act as herein construed that requires redevelopment in the public interests. The determination of that factual question by the municipality is an administrative act and not the exercise of legislative power."

*Belovsky v. Redevelopment Authority,* supra, spoke to the same effect, declaring:

"The fact is, however, that the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation."

In addition to the two decisions from which we quoted, the following rejected contentions similar to the one now under consideration: *The People ex rel. John Gutknecht v. City of Chicago,* supra; *Thomas v. Housing and Redevelopment Authority,* supra; *Zurn*

*v. City of Chicago,* supra; *Nashville Housing Authority v. City of Nashville,* supra; *Wells v. Housing Authority,* supra; *Rowe v. Housing Authority,* supra.

■ We do not believe that the act attempts to delegate to the Housing Authority any power to determine what the law shall be. The act is complete in itself. It states with clarity its policy and sets up in detail the standard which shall govern the Housing Authority. We reject this assignment of error as lacking in merit.

The fifth assignment of error reads:

"The Court erred in refusing to hold said act unconstitutional in that it violates the provisions of Article XI, Section 9 of the Oregon Constitution in that it constitutes the aiding of private individuals by public funds and credit."

The part of Article XI, Section 9, of our Constitution upon which the plaintiffs rely, follows:

"No county, city, town or other municipal corporation, by vote of its citizens, or otherwise, shall become a stockholder in any joint company, corporation, or association whatever, or raise money for, or loan its credit to, or in aid of such company, corporation or association."

The facts in *Hunter v. Roseburg,* 80 Or 588, 156 P 267, 157 P 1065, and *Municipal Security Co. v. Baker County,* 39 Or 396, 65 P 369, cited by the defendants, are not sufficiently similar to those now before us to justify a review of them in this opinion. The Hunter decision held that a contract by the city of Roseburg to furnish $300,000 of the capital needed to build a railroad, which two private corporations planned to construct, was invalid under the provision of our Constitution which is quoted in the preceding paragraph. Through quotation from Ohio decisions, it indicated

a belief that the constitutional provision prohibits a union of public funds with private money in business partnerships. It held that the funds of municipalities can be expended only for public purposes and that the credit of such bodies can be granted only to utilities of a public character. The Municipal Security Company decision held that the constitutional provision under consideration does not prohibit a tenancy in common between a county and a private person.

Article VIII, § 6, Constitution of Ohio, is virtually the same as the part of Article XI, § 9, Constitution of Oregon, which we quoted. *The State ex rel. Bruestle v. Rich,* supra, in rejecting a contention even more comprehensive than plaintiffs', based upon Article VIII, § 6, Ohio Constitution, said:

"It is contended by respondents that the redevelopment project involves the lending of the city of Cincinnati's credit to private persons contrary to the provisions of Section 6 of Article VIII of the Constitution of Ohio.

"It is argued that the city is lending its credit to present owners of property in the area to be developed by paying for buildings which can be condemned under the police power. If the property to be appropriated is subject to condemnation under the police power because of its condition, such cloud upon its value should be reflected in its value. In order to compensate the owner for the value of such property, the city should be required to pay no more than such value. There is, therefore, no lending by the city of its credit to present owners of property in the area.

"It is further argued that the city is lending its credit to prospective purchasers of the redeveloped property by making site improvements contemplated by the redevelopment plan. To the extent that such site improvements do add to the value

of the redeveloped property, the contribution of the city will be reflected in the value of the redeveloped property. It is not proposed to sell the redeveloped property for less than its value. On such sales, the city will recoup any amounts added to the value of such property by site improvements of the city. * * * The city will not, therefore, be lending its credit to prospective purchasers of such property."

*The People ex rel. John Gutknecht v. City of Chicago,* supra, reached a similar result upon a provision of the Illinois Constitution, which reads:

"No county, city, town, township or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation."

See, also, *Nashville Housing Authority v. City of Nashville,* supra; *State ex rel. Porterie v. Housing Authority,* supra; *Opinion of the Justices,* supra; and *Belovsky v. Redevelopment Authority,* supra.

We concur in the reasoning which we quoted from the Ohio decision.

The proposed expenditure which is under scrutiny will be made by a public agency which will acquire the fee to the property. The subsequent improvements upon which public funds will be expended will take place during the public's ownership of the property. If they enhance the value of the property, that fact will be reflected in the re-use value at which the property must be sold.

Our belief that the statute and its authorized expenditure of public money does not conflict with Article XI, § 9, Constitution of Oregon, is fortified by the following decisions which this court rendered

in the past: *Morris v. City of Salem,* 179 Or 666, 174 P2d 192; *Johnson v. School District No. 1,* 128 Or 9, 270 P 764, 273 P 386; *McMahan v. Olcott,* supra; and *Churchill v. Grants Pass,* supra. We find no merit in the fifth assignment of error.

The above completes our consideration of the six assignments of error. We have not discussed every authority cited in the brief of plaintiffs' diligent counsel, but all of them received our consideration.

The attacked decree is affirmed.